###### IN THE

# COURT FOR THE CORRECTION OF ERRORS

###### OF THE

## STATE OF NEW-YORK,

###### DURING THE YEAR 1838.

---

## SALTUS & SALTUS *vs.* EVERETT.

Where the *owner* of personal property has not conferred upon the *vendor* the apparent *right of property* or *right of disposal,* a purchaser is not protected against the claims of the *owner,* though such purchaser acquire the property for a fair and valuable consideration, in the usual course of trade, without notice of any conflicting claim or knowledge of any suspicious circumstances calculated to awaken inquiry, or put him on his guard; and *it was accordingly held,* in this case, that the purchaser of part of a cargo of a vessel, was not protected against the claims of the *real owner,* although the purchase was made under a *bill of lading* regular and *fair, on its face;* it appearing on the trial of the cause, that the master of a vessel in which the goods were originally shipped had *fraudulently,* at an intermediate port transshipped the goods into another vessel, and procured a *bill of lading* in his own name, which he transferred to his agents, the vendors.

The owner has conferred such *apparent* right of property upon the vendor when he has *sold* goods and *delivered possession* thereof, although they were in fact obtained from him *fraudulently;* not so, where they are obtained *feloniously.*

Saltus *v.* Everett.

So he has conferred the *apparent* right of disposal, when he has furnished the ven-
dor with the external *indicia* of such right, as where a *bill of lading* is sent to a
consignee with the power of transfer.

So authority to sell may be *implied*, as well as be *express*, as where goods are placed
by the owner in the custody of a person whose common business it is to sell goods.

The mere shipment of merchandize does not confer upon the *master* of the vessel
authority to dispose of the goods, unless in a case of necessity; and then the
burden of proof showing the necessity lies upon the purchaser. A *carrier by
sea* and a *carrier by land* stand in the same relation to the owner of the goods.

The doctrine that *possession* carries with it the evidence of *property*, so as to protect
a person acquiring property in the usual course of trade, is limited to *cash, bank
bills*, and *bills payable to bearer*.

It *seems*, where a *lien* upon goods exists, and the party when *demand* of the goods
is made, asserts his right to hold *as purchaser*, and *not* on account of the lien, that
he cannot in an action brought against him protect himself under the lien.

A *tender* of the charges must be made before suit, where a *lien* exists, unless the
goods have been parted with; in which latter case all that can be claimed by the
defendant is a mitigation of damages by way of recoupment.

ERROR from the supreme court.  *Everett* brought an action of
*trover* in the superior court of law of the city of New-York
against Messrs. *Saltus*, for a quantity of lead.  In August, 1825,
*Bridge & Vose*, merchants at New-Orleans, shipped 179 pigs of
lead on board the brig *Dove*, of which *William Collins* was mas-
ter, consigned to Messrs. *Tufts, Eveleth & Burrell*, of New-York,
on account and risk of *Otis Everett*, the plaintiff, to whom they
referred for instructions.  The *Dove* put into *Norfolk*, in distress,
and part of the lead was sold, to pay expenses, and the residue
was transferred in December, 1825, by an agent of Capt. Collins,
to the schooner *Dusty Miller*, Captain *Johnson*, who signed a
bill of lading, acknowledging the lead to have been shipped by
F. M., agent for *William Collins*, and promising to deliver the
same in New-York, to order, on payment of freight.  The *Dusty
Miller* met with a disaster on her voyage to New-York, and on
her arrival there, the lead, by the order of Captain Collins, was
delivered to the firm of *Coffin & Cartwright*, who paid the freight,
and $72.87, the *average contribution* charged upon the lead, for
the loss occasioned by the disaster to the *Dusty Miller*.  On the
9th March, 1826, *Coffin & Cartwright* sold the lead to the Messrs.
Saltus, the defendants, for $542.74, and received payment.  The
freight of the lead from New-Orleans to New-York amounted to

Saltus v. Everett.

$14.72.    Everett brought an action against *Coffin & Cartwright*, to recover the value of the lead, but was *non-suited*, in failing to prove that before suit brought, he offered to pay the *freight*, *average* and *charges* to which the lead was liable, and which had been advanced by Messrs. Coffin and Cartwright, and this court, on application, refused to set aside the non-suit.    *See* 6 *Wendell*, 603.    In October, 1831, the plaintiff demanded the lead of the Messrs. Saltus, and offered to pay any lawful demands they had on the same ; to which they answered, that they would have no *further* communication on the subject.    It was proved, that in March, 1826, one of the firm of *Tufts*, *Eveleth & Burrell* demanded of the Messrs. Saltus the lead, or its value, and received for answer, that they had bought the lead, and paid for it, and would not do any thing about it.    Upon this evidence the plaintiff was again non-suited.    Whereupon he sued out a writ of error, removing the record into the supreme court, where the judgment of the superior court was *reversed*.    See opinion delivered in the supreme court, 15 *Wendell*, 475, *et seq*.    The defendants then removed the record into this court, where the cause was argued by

*T. T. Payne*, for the plaintiffs in error.

*T. Sedgwick, jun. & S. P. Staples*, for the defendant in error.

*Points on the part of the plaintiffs in error :*

I.    The plaintiffs in error having purchased the lead in question in good faith, for a full consideration, without notice, either actual or constructive, of any right or claim of the defendant in error, from a party having possession of it, provided with all the evidences of property, and that, too, through the confidence reposed in such party by the agents of the defendant in error, ought to be entirely protected in their purchase.    *Mowry* v. *Walsh*, 8 *Cowen*, 238.    *Root* v. *French*, 13 *Wendell*, 572.    *Parker* v. *Patrick*, 5 *Durn. & East*, 175.    *Queiroz* v. *Trueman*, 3 *Barn. & Cress.* 342.    *Freeman* v. *East India Co.* 5 *Barn. &*

Saltus v. Everett.

*Ald.* 617. 2 *Kent's Comm.* 325. 1 *Bell's Comm.* 280, 287. 2 *Saund.* 47, *b. Bro. Trespass*, 216, 295.

II. The lead in question was not proved to be the property of the defendant in error ; certainly not with sufficient strictness to give him the right of possession, and to entitle him to recover, as general owner, against the plaintiffs in error, who, at least, had a special property in it. Admitting the bill of lading, from New-Orleans, to be sufficiently proved, it shows that the right to sue, if any, was in the consignees, Tufts, Eveleth & Burrell. *Evans* v. *Marlett*, 1 *Ld. Raym.* 271 ; 12 *Mod.* 156, *S. C. ;* 3 *Salk.* 290, *S. C. Lickbarrow* v. *Mason*, 2 *T. R.* 74. *Gordon* v. *Harper*, 7 *id.* 12. *Evans* v. *Marlett* is quoted and relied upon by Buller, J., in his opinion in error in *Lickbarrow* v. *Mason*, printed in a note to *Newsom* v. *Thornton*, 6 *East*, 22. *Yates* v. *St. John*, 12 *Wendell*, 74.

III. The rights of the plaintiffs in error cannot certainly be inferior to those of their immediate vendors, and they must, at least, be protected to the extent of the freights and average, which were lawful charges upon the property itself. *Everett* v. *Coffin & Cartwright*, 6 *Wendell*, 605. *Daubigny* v. *Duval*, 5 *T. R.* 604. *Queiroz* v. *Trueman*, 3 *Barn. & Cress.* 342.

IV. No tender was made to the plaintiffs in error, which could have the effect to discharge these rights, nor was there any conduct on their part which can be interpreted as a waiver of it. *Kraus* v. *Arnold*, 7 *Moore*, 59. *Brady* v. *Jones*, 2 *Dowl. & Ryl.* 305. *Dunham* v. *Jackson*, 6 *Wendell*, 22. *Bakeman* v. *Pooler*, 15 *id.* 639.

V. The plaintiffs in error have the superior equity, in the circumstances of the case ; and the defendant in error having exercised his election as to whom he would sue, and having failed in his suit, ought not to be allowed to come upon the plaintiffs in error, especially after their guaranty in the former suit.

*Points on the part of the defendant in error :*

I. The plaintiff being owner of the lead in question, had a

right to recover it in this action from any person into whose hands it might come. *Everett* v. *Coffin*, 6 *Wendell*, 609. 2 *Black. Comm.* 449. *Paley on Agency*, 262. 2 *R. S. pt.* 4, *ch.* 1, *tit.* 3, *art.* 5. *East's Pleas of the Crown*, 697. *Paterson* v. *Tash*, 2 *Strange*, 1178. J. *Kelyng*, 81, 82. *Abbott on Shipping*, 4th *Am*. ed. 241. *Syeds* v. *Hay*, 4 *T. R.* 261. *Daubigny* v. *Duval*, 5 *id.* 604. *Miller* v. *Race*, 1 *Burr.* 452. *Hartop* v. *Hoare*, 1 *Wils.* 8. *Wilkinson* v. *King*, 2 *Campb.* 335. *McCombie* v. *Davies*, 6 *East*, 538. *Freeman* v. *East India Co.* 5 *Barn. & Ald.* 615 ; 7 *Com. Law R.* 211, *S. C. Guerreiro* v. *Peele*, 3 *Barn. & Ald.* 616. *Morris* v. *Robinson*, 3 *Barn. & Cress.* 196. *Loeschman* v. *Makin*, 2 *Starkie*, 312. *Wheelwright* v. *Depeyster*, 1 *Johns. R.* 471. *Prescott* v. *Deforest*, 16 *Johns. R.* 159. *Mowry* v. *Walsh*, 8 *Cowen*, 242. *Williams* v. *Merle*, 11 *Wendell*, 80. *Root* v. *French*, 13 *id*, 572. *Gibson* v. *Culver*, 17 *id.* 310. *Kinder* v. *Shaw*, 2 *Mass. R.* 398. *Vincent* v. *Cornell*, 13 *Pick.* 297. *Leckey & McDermott*, 8 *Serg. & Rawle*, 500. *Rapp* v. *Palmer*, 3 *Watts*, 178. *Potter* v. *Lansing*, 1 *Johns. R.* 223. *Davis* v. *James*, 5 *Burr.* 2680. *Dawes* v. *Peck.* 8 *T. R.* 330.

II. The defendants never had any lien of any kind on the property in question, and therefore there was no necessity for a tender. *Lempriere* v. *Parley*, 2 *T. R.* 485. *Kinlock* v. *Craig*, 3 *id.* 119. *Id.* 786. *Daubigny* v. *Duval*, 5 *id.* 604. *Maddin* v. *Kempster*, 1 *Campb.* 12. *Sweet* v. *Pym.* 1 *East*, 4. *McCombie* v. *Davies*, 7 *id.* 7. *Martini* v. *Coles*, 1 *Maule & Selw.* *Hiscox* v. *Greenwood*, 4 *Esp. R.* 174. *Hartley* v. *Hitchcock*, 1 *Stark*, 330. *Urquhart* v. *McIver*, 4 *Johns. R.* 112. *Ingersoll* v. *Van Bokkelin*, 7 *Cowen*, 671.

III. If the defendants had a lien on the property, or a right to recover the freight and average on the lead before they gave it up, they waived it by claiming to be the rightful owners of the property as purchasers, or by refusing on that ground to do any thing about it. *Boardman* v. *Sill*, 1 *Campb.* 410. *White* v. *Gaines*, 2 *Bing.* 23 ; 9 *Com. Law R.* 302, *S. C. Thompson* v. *Trail*, 3 *Barn. & Cress.* 36. *Judah* v. *Kemp.* 2 *Johns. Cas.* 412. 2 *Phil. Ev.* 121, 122, 123. *Hall* v. *Daggett*, 6 *Cowen*, 655.

IV. If the doctrine of lien is to be extended to such a case, then the offer made to pay the demand of the defendant was sufficient. 3 *Starkie's Ev. Tender,* 1394. *Douglass* v. *Patrick,* 3 *T. R.* 683. *Thomas* v. *Evans,* 10 *East,* 101. *Carroll* v. *Peake,* 1 *Peters,* 24. *Slingerland* v. *Morse,* 8 *Johns. R.* 476. *Harding* v. *Davies,* 2 *Carr. & Payne,* 77. *Dunham & Jackson,* 6 *Wendell,* 33. *Mills* v. *Hunt,* 17 *id.* 333.

After advisement the following opinions were delivered :

By the CHANCELLOR. The plaintiffs in error were not entitled to the goods in question on the ground, that they were the purchasers thereof without notice of the rights of the real owner ; they were in the same situation in this respect as every other purchaser of goods from a person who had no authority to sell. If the owner of the goods had caused the bill of lading to be made out in the name of *Collins,* so as to give him a prima facie right to the goods as owner, or consignee for his own benefit, *a bona fide* purchaser might have been entitled to protection. The principle adopted in the case of *Mowry* v. *Walsh,* 8 *Cowen,* 238, might be applicable to such a case ; but here the change of the bill of lading itself was a fraudulent act on the part of the master of the vessel, or his agent, and could not defeat the right of the owner of the goods who had not authorized any such change. The bill of lading is, by the custom of merchants, transferable, so as to vest in the assignee the title to the goods which the assignor had in them ; but if a person without authority from me ships my goods and takes a bill of lading in his own name, he cannot, by assigning that bill of lading to another, divest my title to the property. If by the perils of the sea, or otherwise, the master of the *Dove* was unable to continue the voyage, and he was obliged to send on the cargo by another vessel, he had no right to change the consignee of the goods ; and if he wished to retain a lien upon the goods for the freight *pro rata itineris,* he should have done so by a special clause in the new bill of lading. In this case the unauthorized sale of the goods in the port of New-York, by the master of the *Dove,* was probably

such an act as would now be a felony, under the provisions of the Revised Statutes prohibiting carriers of goods, delivered to them to be transported for hire, from embezzling the goods or converting the same to their own use ; and even at the time when this transaction took place, no rights could be acquired by third parties, as against the owner of the goods, by such a fraudulent act of the carrier to whom they were entrusted for carriage or transportation merely.

The question does not arise on this writ of error whether the Messrs. Saltus by the purchase were substituted in the place of *Coffin & Cartwright* as to the *lien* upon the goods for the freight paid by them to the master of the *Dusty Miller*. If there had not been an actual conversion of the goods before the commencement of the suit, the question would arise whether there ever was a lien which the purchasers from Coffin & Cartwright could claim the benefit of ; and, if such lien existed, whether it had not been waived by putting their claim to retain the goods upon other grounds. It appears, however, by the evidence, that the plaintiffs in error had actually converted the goods, by selling them on the day of their purchase ; and if they once had a lien which would have rebutted the presumption of a conversion, from the mere fact of refusing to deliver on demand, when the amount of the lien was not tendered or offered to be paid, a tender after they had put it out of their power to receive the money and deliver the goods, by an actual sale, would have been a useless ceremony, and was not necessary to enable the owner of the goods to recover in an action of trover. In such a case if there was a valid lien in favor of the defendants before the conversion, they would be entitled to be *recouped* in the damage, to the extent of such lien ; but they could not defeat the plaintiff's action altogether.

The bill of lading signed by Collins at New-Orleans was only *prima facie* evidence that the consignees were the owners of the property, and the letter of Bridge & Vose, the shippers, which was sent to the consignees with the bill of lading, was sufficient to rebut that presumption and to show that the property really

Saltus v. Everett.

belonged to Otis Everett of Boston, in whose name the suit was brought. Besides, one of the consignees was examined as a witness, and proved that Everett, and not the consignees at New-York, was the real owner of the goods. I have no doubt, therefore, that the judgment of the supreme court was correct, and that it ought to be affirmed.

By Senator VERPLANCK. This cause, though of small magnitude as to the amount of property in question, has been contested in various forms through all the courts to this tribunal of last resort.

The spirit of contentious litigation ought to find little favor here ; yet in this instance, I think, the parties have deserved well of the public, because the main question in the case is of great importance and must frequently arise in a commercial community. It ought, therefore, to be distinctly settled on principles of general application. That those principles are not very clearly settled in our state, we need no higher evidence than the manner in which this cause now comes before us. The supreme court have reversed the unanimous decision of the superior court of law of the city of New-York, and on the broad principles governing the questions which we are now to decide, there is a direct contrariety between the opinions of our highest court of common law and those of our most eminent commercial tribunal, as delivered by their chief justice, who was formerly chancellor of this state.*

---

* The following is what was said by Chief Justice Jones in the superior court of law of the city of New-York, on the main question in this case:

"It must be conceded, that a purchaser, for a fair and valuable consideration in the usual course of trade, without notice of any conflicting claim, or any suspicious circumstances to awaken inquiry, or to put him on his guard, will, as a general rule, be protected in his purchase, and unaffected by any latent claims. But there are exceptions to this rule, and it is supposed by the plaintiff that he comes within them. He was the owner of the lead, and Collins, the master, who assumed the power of disposing of it, was a mere carrier, to whom it was entrusted for the purpose of transportation; and the sale of it, by him, was without necessity, and wholly unauthorized. It is, on this ground, contended that the sale was void, and that no title passed by the transfer. There can be no question, that an agent for a special purpose, has no authority to sell the property of his principal, unless in cases of abso-

Saltus *v.* Everett.

The main question depends upon and involves the general rule that ought to govern, between the conflicting rights of *bona fide* purchasers of personal property, bought without notice of any opposing claim, and those of the original owner divested of the possession or the control of his property by accident, mistake fraud or misplaced confidence.   The original owner now claims his lead against purchasers who bought for a fair price, in the usual course of trade, from persons holding the usual evidence of such property, (a bill of lading endorsed to them,) and in actual possession of the goods.   Of these two innocent parties, which of the two is to bear the loss arising from the wrong-doing of the third ?

The universal and fundamental principle of our law of personal property, is, that no man can be divested of his property without his own consent ; and, consequently, that even the honest purchaser under a defective title cannot hold against the true proprietor.   That " no one can transfer to another a better title than he has himself," is a maxim, says Chancellor Kent, " alike

lute necessity; and it is admitted that a master of a vessel stands in that relation to the shipper of goods.   But a master, who is at the same time consignee of the goods, and, for still higher reasons, one who fills himself the character of shipper, has an undoubted power to sell, and his bona fide transfers will be effectual to purchasers, against any secret trust for others, with which his apparent title may be affected.   If it be known to the purchaser that the vendor acquires the possession of the goods and his title to them, in quality of shipmaster, or if he has notice of any circumstances tending to show that others are interested in the property, he buys at his peril, and his title will be invalid as against the true owner.   There is, moreover, one class of cases to which the law extends a still greater protection.   It is the case where the vendor acquires the possession of the goods without any act or agency of the owner, and against his will: as, for example, *where they are stolen*, or come to the possessor *by finding*.   In the first of these cases, no title can be transferred, even to a bona fide purchaser ; and in the last, the whole burden of proof, t sustain the purchase, is thrown upon the buyer.   Reasons of policy, as well as a sense of justice, have led to these rigid rules in those special cases, and the favorable operation of them, as general principles, to the community at large, reconciles us with the severity with which they sometimes press upon innocent purchasers. And all the cases cited are referrable to, and governed by, these principles, as a short review of them will show.   But does this case come within that privileged class ? Collins was *not* the master of the vessel in which the lead was imported, but was the holder of the bill of lading signed by Johnson, the master, for it.   He was the

Saltus *v.* Everett.

of the common and the civil law, and a sale, *ex vi termini*, imports nothing more than that the *bona fide* purchaser succeeds to the rights of the vendor." The only exception to this rule in the ancient English jurisprudence was, that of sales in markets overt, a custom which has not been introduced among us. " It has been frequently held in this country that the English law of markets overt had not been adopted, and consequently, as a general rule, the title of the true owner cannot be lost without his consent." 2 *Kent's Comm.* 324, *and cases there cited.*

To whatever and however numerous exceptions this rule of our law may be subject, it is unquestionably the general and regulating principle, modified only by the absolute necessity or the obvious policy of human affairs. The chief justice of the superior court has said, in his opinion on this case, that " it must be conceded that a purchaser for a fair and valuable consideration in the usual course of trade, without notice of any conflicting claim or any suspicious circumstances to awaken inquiry, or to

---

apparent owner. The bill of lading imported, that it was shipped by his agent for him, and it was consigned to order, and the bill of lading delivered to him. It was mixed up with goods of his own. He, thus vested with the apparent ownership, and possessing the documentary title, consigned the whole to Coffin & Cartwright, and contracted to sell the lead to the defendants, who completed the purchase with the consignees, and paid the price to them. There is no one circumstance in evidence tending to show the defendants that the plaintiff had any interest in the property, nor was there any thing unusual or extraordinary in the transaction to lead them to distrust the right of Collins to sell. It is not uncommon to consign goods to the master for sale by him. But, in this case, Collins did not act in the character of master, but of owner. He may have committed a fraud on the plaintiff, but fraud in the vendor is not of itself sufficient to invalidate the title of the purchaser. Who enabled Collins to commit the fraud, assume the ownership, and sell the goods ? The agent of the plaintiff. He did not obtain the property by theft or by finding. The possession of it was delivered to him by the owner. The delivery was for a special purpose, it is true, but he was enabled, by that delivery, to change the character of the possession, and by the new bills of lading, from the intermediate agent at Norfolk, he fraudulently converted the property, represented himself as owner, and suppressed all evidence of his agency for the plaintiff. To hold a purchase, by an innocent party, of such a vendor to be invalid, as against the plaintiff, would be carrying the principle far beyond any case latterly decided, and tend to involve purchasers in great and unreasonable peril."

put him on his guard, will, as a general rule, be protected in his purchase, and unaffected by any latent claim.   But there are exceptions to this rule."   Now I cannot agree with the learned chief justice that this is the general rule.   On the contrary, I think it obvious that it is but the broad statement of a large class of exceptions to the operation of a much more general principle, and that statement of exceptions is subject again to many limitations.   I have stated the general and governing law ; let us now see what are precisely the exceptions to it.

The first and most remarkable class of these exceptions, relates to money, cash, bank bills, checks and notes payable to the bearer or transferable by delivery, and in short, whatever comes under the general notion of currency.   It was decided by Lord Chief Justice Holt, at an early period of our commercial law, that money and bills payable to bearer, though stolen, could not be recovered after they had passed into currency ; and this "by reason of the course of trade which creates a property in the holder."   "They pass by delivery only, and are considered as cash, and the *possession* always carries with it the *property.*" 1 *Salk.* 126.   A long series of decisions, beginning with *Miller* v. *Race*, 1 *Burr.* 452, has now settled the law, that possession of such paper is presumptive proof of property, and that he who received it in the course of trade for a fair consideration, without any reason for just suspicion, can hold it against the true owner, and recover on it against the drawer, maker and others parties, even if the paper had been stolen from or lost by the former holder ; such former holder retaining all his original rights only against the thief or the finder, or whoever received the paper from them under suspicious circumstances.   These decisions have been argued upon as authorities (at least in the way of analogy) both at bar and in opinions of the courts, in cases involving the same question as to goods or other moveable property.   Hence, it was inferred that goods bought or received "in the course of trade, stand on the same footing with bank notes or checks so received."   But an examination of the cases

will show that this part of the law of negotiable paper rests on grounds quite peculiar to itself, for the following reasons : 1. The protection of the *bona fide* holder of paper, transferable by delivery, extends even to cases where the paper has been lost or stolen. But it has been often decided that loss by accident, theft or robbery, does not divest the title of the owner of *goods,* nor give a title in them to a fair after purchaser. 2. The rule is put by all the authorities on the express and separate ground of the necessity of sustaining the credit and circulation of the currency. Thus Lord Chief Justice Hardwicke : "No dispute ought to be made with the holder of a cash note, who came fairly by it, for the sake of currency, to which discrediting such notes would be a great disturbance." See, too, the reasoning of Lord Mansfield, in all cases on this head decided before him. Thus says he, in the case of a stolen note, *Peacock* v. *Rhodes,* 1 *Doug.* 636, "An assignee must take the thing assigned, subject to all the equity to which the original party was subject. If this rule was applied to bills, it would stop their currency." Similar reasons are assigned for the same decision by American judges. 3. The analogy between notes and moveables or goods, is expressly denied in the leading cases on this head. Thus in reply to an argument founded on that similarity, Lord Mansfield answers, 1 *Burr* 457, "The whole fallacy of the argument rests upon comparing bank notes to what they do not resemble, and what they ought not to be compared to, viz. goods, or securities, or documents for debts. Now they are not goods, nor securities, nor similar to them ; they are treated as cash to all purposes," &c.

Setting wholly aside then, this part of the law as to cash, bank notes, and bills to bearer, as founded on the peculiar necessities of currency and trade, and regulated by decisions and usages peculiar to itself, what rules do we find to obtain in other instances of conflict between the rights of original owners and those of fair purchasers ? After a careful examination of all the English cases and those of this state, that have been cited or

Saltus *v.* Everett.

referred to, I come to this general conclusion, that the title of property in things moveable can pass from the owner only by his own consent and voluntary act, or by operation of law; but that the honest purchaser who buys for a valuable consideration in the course of trade, without notice of any adverse claim, or any circumstances which might lead a prudent man to suspect such adverse claim, will be protected in his title against the original owner in those cases, and *in those only*, where such owner has by his own direct voluntary act· conferred upon the person from whom the *bona fide* vendee derives title, the apparent right of property as owner, or of disposal as an agent. I find two distinct classes of cases under this head, and no more.

I. The first is, when the owner with the intention of sale, has in any way parted with the actual property of his goods, with his own consent, though under such circumstances of fraud or error, as would make that consent revocable, rescind the sale, and authorize the recovery of the goods as against such vendee. But if the property passes into the hands of honest purchasers, the first owner must bear the loss. Thus, to take an instance from our own reports, where goods were obtained by a sale on credit, under a forged recommendation and guaranty, and then sold to a *bona fide* purchaser in the customary course of trade, the second buyer was protected in his possession against the defrauded original owner. *Mowry* v. *Walsh*, ·8 *Cowen*, 243. So, again, where the owner gave possession and the apparent title of property to a purchaser, who gave his worthless note, in fraudulent contemplation of immediate bankruptcy, a fair purchase from the fraudulent vendee was held to be good against the first owner. *Root* v. *French*, 13 *Wendell*, 572. *See also McCarty* v. *Vick*, 12 *Johns. R.* 348. In all such cases, to protect the new purchaser, there must be a full consent of the owner to the transfer of property, though such consent might be temporary only, obtained by fraud or mistake, and therefore revocable against such unfair first purchaser.

II. The other class of cases in which the owner loses the right of following and reclaiming his property is, where he has, by his

own voluntary act or consent, given to another such *evidence* of the right of selling his goods as, according to the custom of trade, or the common understanding of the world, usually accompanies the authority of disposal ; or, to use the language of Lord Ellenborough, when the owner " has given the external *indicia* of the right of disposing of his property." Here it is well settled that, however the possessor of such external *indicia* may abuse the confidence of his principal, a sale to a fair purchaser divests the first title, and the authority to sell so conferred, whether real or apparent, is good against him who gave it.

Thus, the consignee, in a bill of lading, is furnished by his consignor with such evidence of right of disposal, according to the custom and law of trade, so that the *bona fide* holder of the bill endorsed by the consignee is entitled to all the rights of property of the consignor in those goods, if bought fairly in the course of business, although the actual consignee, under whose endorsement he holds, has no right to the goods as against the former owner. If such goods were not paid for, they might be stopped *in transitu* by the owner, unless his consignee has already assigned his bill of lading; but that assignment divests the owner of his right of stoppage against such assignee.

The famous series of decisions in the various courts in the case of *Lickbarrow* v. *Mason*, 2 *T. R.* 63, 2 *H. Black, R.* 11, 5 *T. R.* 367, which led to the establishment of the doctrine of this qualified negotiability of bills of lading, memorable alike in legal and commercial history, strongly illustrates the whole question before us. There, Buller and his associate judges, trained up at the feet of the great father of English commercial jurisprudence, maintained and established the law as we now hold it, under the influence of Mansfield's genius, upon his reasoning and on his authority, against those of Lord Loughborough and others, the most learned lawyers of their times. All the arguments and admissions of both sides show how deeply the general principle is rooted in the law of England, that (to use Lord Loughborough's words) " mere possession, without a just

Saltus *v.* Everett.

title, gives no property, and the person to whom such possession is transferred by delivery, must take the hazard of the title of its author." It is only as an express exception to this rule that it was maintained, and finally established, that the custom of merchants, evidenced and sanctioned by legal decisions, and founded on those conveniencies of trade, so admirably stated by Buller, had compelled the courts to consider the owner as giving his consignee evidence of the power of disposal, which it was not for him to dispute when the goods had fairly passed into other hands on the faith of that evidence. But there is no case to be found, or any reason or analogy any where suggested in the books, which would go to show that the real owner could be concluded by a bill of lading not given by himself, but by some third person, erroneously or fraudulently, as in this present case. The assignment of the bill of lading conveys, not an absolute right to goods, but the right and title merely of the actual consignor, who alone is bound by it.

Again : the owner may lose the right of recovering his goods against purchasers, by exhibiting to the world a third person as having power to sell and dispose of them ; and this, not only by giving a direct authority to him, but by conferring an implied authority. Such an authority may be implied by the assent to and ratification of prior similar dealings, so as to hold such person out to those with whom he is in the habit of trading, as authorized to buy or sell. It may be inferred from the nature of the business of the agent, with fit accompanying circumstances. "If a man," says Bayley, J. in *Pickering* v. *Bu$k*, 15 *East*, 44, "puts goods into another's custody, whose common business it is to sell, he confers an implied authority to sell ;" and the cause was decided on that ground. But this implied authority must arise from the natural and obvious interpretation of facts, according to the habits and usages of business ; and it never applies where the character and business of the person in possession, do not warrant the reasonable presumption of his being empowered to sell property of that kind. If, therefore, to use an illustration of Lord Chief Justice Ellenborough, in the case just cited, a per-

son entrusts his watch to a watchmaker to be repaired, the watch-maker is not exhibited to the world as an owner, or agent, and credit is not given as such, because he has possession of the watch; the owner, therefore, would not be bound by his sale. When these exceptions cease, the general rule resumes its sway ; and the law is therefore clear, that an agent, for a particular purpose, and under a limited power, cannot bind his principal if he exceed his power. "Whoever deals with an agent constituted for a special purpose, deals at his peril, when the agent passes the precise limits of his power." 2 *Kent's Comm.* 621, *and the authorities there cited.*

Beyond the precise exceptions I have above stated, I think our law has not carried the protection of the fair vendee against the defrauded or unfortunate owner. It protects him when the owner's misplaced confidence has voluntarily given to another the apparent right of property or of sale. But if the owner loses his property, or is robbed of it, or it is sold or pledged without his consent by one who has only a temporary right to its use by hiring, or otherwise, or a qualified possession of it for a specific purpose, as for transportation, or for work to be performed on it, the owner can follow and reclaim it in the hands of any person, however innocent. Among the numerous cases to this effect, I will cite only that of *Howe* v. *Parker,* 2 *T. R.* 376, which I select not only on account of the strong and unhesitating manner of the decision, but because it was pronounced by the very judges who, in the case of *Lickbarrow* v. *Mason,* had carried the protection of a *bona fide* purchaser under a bill of lading far beyond the rigor of the ancient law. There, plate had been pawned by a widow who had only a life interest in it under her husband's will, of which fact the pawnee had no notice. It was not doubted that the lien for the monies advanced on such pledge was void against the remainder-man, after the widow's death. "*Per curiam :* This point is clearly settled, and the law must remain as it is, until the legislature think fit to provide that the *possession* of such chattels is *proof* of ownership."

In order to decide in such conflicts between the claims of

equally meritorious sufferers by the wrong of a third party, public policy must draw an arbitrary line somewhere, and the greatest merit of such a rule must be its certainty and uniformity.

The rule of our law, as I understand it, is perfectly consistent with the equity between the parties, as far as such equity can apply; and it serves the great interests of commerce, in a state of such extensive foreign and domestic trade as ours, by protecting the property of the stranger, as well as of our own citizens, against the possible frauds of carriers by sea, or by internal transportation, whilst it throws upon the resident merchant the responsibility of taking care with whom he deals, and teaches him a lesson of wholesome caution. It is no mean proof of the wisdom of the rule, that it agrees in substance with the provisions of the Napoleon Code. The code, like our law, holds as a general rule, that the sale of goods, by any but the true holder, is a nullity; *" La vente de la chose d'autrui est nulle."* Code *Civil* III. *art.* 1599. It confines the authority of the special agent or *mandataire* to the strict limits of his power; and in sales, the power must always be special and express. *Code Civil, art.* 1989. It allows the right of *revendication* or stoppage *in transitu* against the insolvent or fraudulent purchaser or consignee; but that right ceases, as with us, against the consignee, when the goods have been fairly sold according to the bills of lading; *" vendues sans fraude sur factures et connaissements."* *Code de Commerce, Liv.* III., *art.* 576, 577, 578. The Scotch law, as I gather from *Bell's Commentaries,* lays down a different rule, that "a purchaser, in the course of trade, should be protected in the purchase of goods from any one who has them in lawful possession." This agrees with the doctrine of our superior court, and might be a safe enough rule, if generally adopted and understood. But it is not the rule of our own law, which is perhaps quite as wise, as well as certainly founded on a much larger and wider commercial experience.

Let us apply these conclusions to the present case. Collins, the person whose sale it is asserted must divest the original

owner of his rights in favor of the *bona fide* purchaser, stands, it is said by the superior court, in a double relation of " a master, who is at the same time the consignee of the goods, and who himself filled the character of shipper, and has therefore an undoubted power to sell, and his *bona fide* transfer will be effectual to purchasers against any secret trust for others with which his apparent title might be affected." Had the lead been consigned to Collins from the intermediate port, by the *owner* or his agent, this would be true. But it is shipped by Myers, of whom neither the owner, nor any one with full power to represent him in this matter, had any knowledge as an agent, and under whose care the vessel and cargo were placed by Collins, so that he appeared only as his representative, and thus he styles himself in the bill of lading. The plaintiff below comes in nowise within the rule I have stated. He has neither given to Collins documentary and mercantile evidence of property in a bill of lading from himself or his own agent with competent power, nor the evidence customary in business, such as to hold him out as an agent authorized to change the title of his property in his goods. The assumed authority of shipping goods in his own name and to his own order, at Norfolk, and the documentary evidence of it in the bill of lading, can have no more effect as to the title of the property, than if he had forged such a bill of lading at New-Orleans.

Neither does the selection of a ship and its master vest in the master any implied authority to sell the ship, or any part of her cargo. His business is to carry the goods, and no more, with some other clearly defined and very limited powers, to be exercised only in cases of absolute necessity. He stands in the same legal relation to his cargo with the watchmaker, in the case supposed by Lord Ellenborough, who has in his hands a watch to be repaired. He is not exhibited to the world as the owner, or agent for selling ; and if he does sell it, the sale is void against the true proprietor. The law of shipping is well known to the commercial world, to declare that the master has no authority to sell the cargo, or any part of it, unless under circumstances of pressing necessity abroad ; and of that absolute necessity, the

Saltus *v.* Everett.

burden of proof rests on the purchaser, and the presumption is against it. As Judge Bayley states the law, 3 *Barn. & Cress.* 196, " The captain has no right to act as *agent* for the owner of goods, unless in absolute necessity. The purchaser obtains no property by the act of his professing to sell." And this was held where the master acted in perfect good faith. How much stronger is the case of a probable fraud! Thus again : in *Freeman* v. *East India Co.* 5 *Barn. & Cress.* 619, Abbott, Ch. J., says, " a sale of a cargo, or any part of it, by the master, can confer no title, unless there was an absolute necessity;" and the reason of the rule is thus assigned by Judge Best in the same case : " A carrier by sea and by land stands in the same relation to the owner of goods to be carried. Their duty is to carry the goods, and the authority only such as is necessary. The purchaser, knowing that necessity alone can justify the sale, and give him a title to what he buys, will assure himself that there is a real necessity for the sale before he makes the purchase ; and *caution on his part will prevent what has frequently happened, the fraudulent sale of ships and cargoes in foreign ports.*" Such, then, being the well settled and generally known law, the selection of a master or any other carrier, by sea or land, does nothing to exhibit such a carrier to the world as having the power of disposing of the goods he carries. The owner does nothing to enable him to commit a fraud on third persons. He gives merely a qualified possession, and if that is turned into an assumed right of ownership, it is a tortious conversion, and will not divest the owner's title.

It is true that the rule will sometimes, as was urged by Chief Justice Jones, " involve purchasers in great perils ;" but that peril can scarcely be called " unreasonable," since there is a reason of public policy of at least equal weight to counterbalance this inconvenience. It is the same which is the ground of the absolute prohibition to a master or carrier to sell the goods he transports, except under insurmountable necessity ; it is to prevent, in the language of the court in the case just quoted, 5 *Barn. & Cress.* 620, " fraudulent sales of ships and cargoes in foreign

ports." Now the fraudulent consignment or change of the apparent evidence of property for the purpose of selling elsewhere, is but another form of the same evil. I may add that this same rule, however rigid and occasionally hard in its operations, is no small safegard to the protection of the owner's rights in goods and other property, in active commerce necessarily placed under the temporary control, and in the legal though qualified possession of agents, sailors, carriers, boatmen, servants and clerks, as well as of those who may have them stored for safe keeping, and their clerks, porters and servants.

On the other question, as to the right of the defendants below to stand in the place of their vendor, and to be protected to the extent of the charges on the lead for freight, as claimed by Collins, I need say but little. The right of lien in such circumstances, (if any right exist here,) depends upon actual possession by the factor, or carrier, or his immediate agent. When the goods are sold and delivered to a third person, the lien, as such, expires with the possession. This is the distinction between the present case and the former suit against Coffin & Cartwright, who were immediate agents or bailees of Collins.

The two courts below have agreed in deciding against the validity of the objections to the evidence raised on the trial of the cause, and I have nothing to add to the reasons they assign; to all which I fully assent.

The importance of the principles and rules not only of decision but of active business involved in this cause, especially in relation to that vast and busy community which I immediately represent in this body, has led me to examine this whole head of law with an interest and at a length wholly disproportioned to the amount of value in controversy. If the views I have been able to present shall in any way, directly or indirectly, tend to settle the law on this head, or make it more clearly and correctly understood, the study I have given the subject will have been well bestowed.

I am of opinion that the judgment of the supreme court, reversing that of the superior court of New-York, be affirmed.

             Judgment unanimously AFFIRMED.