## VAN AMEE and others *vs.* THE PRESIDENT, &c. OF THE BANK OF TROY.

Where a promissory note, left by the holder with a bank, for collection, is sent by such bank to another bank *to be collected, or returned,* the latter bank, *if it* have notice that the note does not belong to the bank from whom it was received, or if the circumstances known to its officers are such as to put them upon inquiry, can not, as against the owner, retain the note for a balance due to such bank from the bank transmitting it; especially in the absence of any express agreement that such bank should have a lien upon the notes sent to it by the other bank for collection.

*It seems*, that under such circumstances, the bank to which the note is sent may be treated by the owner as his *agent;* unless the bank is in a position to insist upon its mere legal title, on the ground that it is a *bona fide* holder without notice of the owner's rights.

THIS was an action to recover the value of a note of which the following is a copy : " $116,64.   New-York, May 26, 1848. Six months after date I promise to pay to the order of James Van Amee & Co. one hundred and sixteen $\frac{64}{100}$ dollars at the Troy City Bank, value received. (Signed)   B. F. McNITT." (Indorsed)   " Jas. Van Amee & Co.—Pay John Paine, Esq. cashier, or order.   T. OLCOTT, Cash."

Paine was cashier of the defendants.   The complaint averred that the note was indorsed by the plaintiffs on the 16th of June, 1848, for the sole purpose of constituting an agency for the collection and receipt of money thereupon for their use; and delivered to and accepted by the Canal Bank for that purpose, and was delivered to the defendants by the Canal Bank for the same purposes.   That the Canal Bank failed on the 11th day of July, 1848, and had no power to transfer any interest in the note to the defendants.   That a receiver of the Canal Bank had been appointed, and the plaintiffs had themselves, and also through the receiver, demanded the note.   The defendants set up an agreement and practice between the Canal Bank and them, by which they mutually remitted notes, &c. payable at

their respective banks or in the vicinity, which, when paid, were credited to the party who sent them, in an account kept by both banks, and that a balance was struck, and that balance transmitted to the creditor bank on Monday of each week. That such notes were always regarded by the party receiving them as the property of the bank transmitting them; and this note was so received and considered. That on the 11th day of July, the Canal Bank was indebted in the sum of $10,000 to the defendants, after crediting this note to the Canal Bank. That the defendants were accustomed to transmit to the Canal Bank, large sums of uncurrent money issued by other banks, and for these sums the Canal Bank then owed the defendants $3100. That the defendants knew nothing of the plaintiff's claim, until a demand of this note was made, after the Canal Bank had failed. On the contrary, upon the faith of this and other demands of a similar kind, the defendants sent to the Canal Bank notes, &c. to a large amount, to collect, and suffered large balances in the defendants' favor to accrue and remain in said Canal Bank. And they denied that this note was placed in the Canal Bank for collection, or that it was ever the property of the plaintiffs, to the defendants' knowledge; and averred that the plaintiffs had transferred all their interest to the Canal Bank and the Canal Bank to the defendants.

The plaintiffs took issue upon the material parts of the defendants' answer.

It appeared the defendants received the note in question from the cashier of the Canal Bank, inclosed in a letter, of which the following is a copy:

"Canal Bank, Albany, June 16th, 1848. John Paine, Esq. Cash. Dear Sir, I enclose for account.

| | | |
|---|---|---|
| Ward & Co. on Ide, Coit & Co. | | 187. |
| Do. | Do. | 243,00. |
| R. F. McNitt. | | |

Very truly, y'rs,
T. Olcott, Cashier."

It was proved that the note was left by the plaintiffs at the Canal Bank on the 16th of June, 1848, for collection, and entered on a book kept for that purpose, and not on the deposite book. There was, however, no mark upon the note to that effect. That the defendants were the agents of the Canal Bank for the purpose of collecting notes in the city of Troy. The accounts were settled on Monday of each week, and each then drew for what the other had collected, and the difference was paid by a check upon some bank in New-York. When the Canal Bank suspended, on the 11th of July, 1848, it had an amount of notes not then matured, which had been sent there for collection by the defendants, and which the defendants drew out in a day or two after the failure. The practice was, when a note was collected, to credit the amount to the other bank, and if not collected to return it and charge postage and protest. It was also testified that it was the practice, when occasion required, to withdraw such notes, by a request to that effect, after they had been sent to the other bank for collection. The defendants ceased to send paper to the Canal Bank for collection sometime before its failure, but how long the witness could not remember; though he thought ten days or two weeks. That between that time and the failure of the bank, paper to the amount of $6000 or $7000, which had been sent by the defendants to the Canal Bank for collection, fell due and was not withdrawn. The teller of the defendants testified, that the reason this and other paper was not withdrawn, was because the defendants had notes sent by the Canal Bank to the defendants for collection, and this note among them. That he asked the cashier of the defendants whether they should withdraw the paper they had sent to the Canal Bank, who answered, that they would let it mature in the latter bank, and did so. This testimony was offered and given to show that the defendants relied upon the paper in their hands to indemnify them against any loss that might happen. It was objected to, and the court held that the defendants might show their acts, though not mere conversation between the officers of the bank.

The cause was tried by the court, without a jury.

*N. Hill, Jr.* and *A. K. Hadley*, for the defendants.

*M. T. Reynolds* and *H. C. Van Vorst*, for the plaintiffs.

HAND, J.   There is no evidence of any express agreement that the Bank of Troy should have a lien upon the notes sent to it for collection by the Canal Bank.   The defence, then, must be sustained, if at all, it seems, on the ground of their lien as bankers.   As a general rule, a banker has a general lien on all securities in his hands belonging to a customer, for the general balance due from the latter.   (2 *Kent*, 641.   2 *Selw. N. P.* 539.   *Davis* v. *Bowsher*, 5 *T. R.* 488.)   But on the other hand, if the securities do not belong to the debtor, but to a third person, *prima facie*, the real owner may claim them unless divested of that right by his own act or assent.   (*Saltus* v. *Everitt*, 20 *Wend.* 267.   *Hoffman* v. *Carow*, 22 *Id.* 318.)   The note in controversy in this case, undoubtedly belonged to the plaintiffs; and was indorsed by them and placed in the Canal Bank for the purposes of collection merely.   And they should have the avails unless the defendants are authorized to treat it as their own or the property of the Canal Bank; or can insist upon a lien as against that bank.   As the plaintiffs treated it as negotiable, and gave possession of it to the Canal Bank, and the Canal Bank made an indorsement payable to the defendants, the instrument carries upon it evidence that the legal title is in the defendants.   This, however, will not avail them if they are not in a situation to be considered. *bona fide* holders.   If they had notice that the note did not belong to the Canal Bank, or if the circumstances known to them were such as to put them upon inquiry; in short, if they have not the right of possession as a *bona fide* holder, they can not hold it as against the owner.

Notwithstanding the general rule above laid down in regard to a banker's lien, there is another rule equally as well settled ; that this lien may be controlled by, and be dependent upon circumstances.   Almost every opinion establishing the right, affirms the qualification.   In *Davis* v. *Bowsher*, (*supra*,) Lord

Kenyon recognized the lien upon the securities in a banker's hands for a general balance, "unless there be evidence to show that he received any particular security under special circumstances, which would take it out of the common rule." And the late Chancellor Kent says it is "subject equally to be controlled by special circumstances." (2 *Kent*, 641.) The recent case in the court of appeals, of *Clark* v. *The Merchants' Bank*, (2 *Comst.* 380,) was not one of lien. Clark & Co. the plaintiffs, were brokers in Philadelphia, and Smith & Co. were brokers in New-York; and they were collecting agents for each other, and business correspondents, and had been for years; and usually, though not always, drew against paper sent for collection. Each kept two accounts, one (No. 1) contained the remittances of the plaintiffs to Smith & Co., and the other (No. 2) the funds of Smith & Co. transmitted to plaintiffs. The plaintiffs, on the 15th of the month sent a sight draft by a house in Richmond on a house in New-York, for $7000, indorsed to the plaintiffs, and by them to Smith & Co. with other paper, a list of which was headed "For account (No. 1,)" in all, amounting to over $17,000 beside other paper amounting to between $2000 and $3000, for collection; and the plaintiffs sent in the same communication, their drafts on Smith & Co. amounting to over $20,-000, all of which was received by Smith & Co. on the 16th, who presented the draft for $7000 to the drawers on that day and received a check on the Phenix Bank, New-York, which, on the same day, Smith & Co. indorsed and deposited with the defendants, who received the money in the usual course of business, on the 17th. Smith & Co. failed on the 16th, and did not pay the drafts of the plaintiffs upon them, and on the 18th the plaintiffs claimed the proceeds of the check of the drawees, and afterwards sued the defendants. The court of appeals held that it was sent to be placed to the credit of the plaintiffs, to be drawn against, in the usual course of business, and that the plaintiffs could not recover; and reversed the judgment of the superior court of New-York in their favor. Gardiner, J. in delivering the opinion of the court, put it upon the ground that the check was transmitted to be credited to the plaintiffs, and not for collection.

*Brandão* v. *Barnett* is reported three times.    It was first decided in the court of common pleas in 1840, (1 *M. & G.* 908;) next in the court of exchequer chamber in 1843, (6 *Id.* 630;) and lastly, in the house of lords in 1846, (3 *M., G. & S.* 519.) Burn was the agent, for many years, of Brandão; who, at first resided at Rio de Janeiro, and after in Portugal.   Burn bought on account of the plaintiff and with the plaintiff's money, certain exchequer bills, and deposited them in a tin box which he kept at his bankers, the defendants; he retaining the key of the box.    Whenever it became necessary to receive the interest on the exchequer bills and to exchange them for new ones, Burn was in the habit of taking them out of the box and giving them to the defendants for that purpose; such being the usual course of business; after which, the new exchequer bills were handed over to and locked up by Burn in the box; the amount of interest, received by the defendants, being passed to the credit of Burn's account.    But the exchequer bills, themselves, were never entered to Burn's credit.    The defendants had no knowledge or notice that the bills were not the property of Burn. On the 1st of December, 1836, Burn took the exchequer bills out of the box and gave them to the defendants to obtain the interest and new bills, which was done on the 20th of December, by the defendants.    Burn was unwell when he delivered the bills to them, and afterwards grew worse, and was, in consequence, out of town three or four weeks; and was generally absent until his failure, on the 23d day of January, up to which time the new bills remained in the possession of the defendants.    When he failed he had largely overdrawn his account with the defendants, and had drawn out and paid in large sums during the time the bills were in their hands.    The exchequer bills were transferable by delivery.    The plaintiff never knew who were Burn's bankers till he failed, nor did the defendants ever receive any information of any transaction between Burn and the plaintiff.    The suit was brought for the new exchequer bills so received by the defendants; and which had not been returned to Burn as above stated.    The defend-

ants claimed that they had a lien upon the bills for the general balance due to them from Burn.

The court of common pleas gave judgment for the plaintiff. Tindall, C. J. admitted the general lien that bankers have upon the securities of their customers in their hands, unless there be something to show that such lien was not intended to arise; but he said this lien arises like other liens out of contract, and this contract being between the banker and the customer, could not take away the rights of other parties; and he thought that nothing had passed between Burn and the defendants amounting to a representation that Burn owned the bills, or that he had authority to pledge them. That had he pledged them, he would have been guilty of a statuteable misdemeanor, and there was nothing to show that to be his intention.

The court of exchequer chamber reversed this judgment. Lord Denman, Ch. J. delivered the opinion of the court, and said, that the rights of bankers do not extend to all securities which may happen to be in their hands for any purpose, but to such only as come to their hands as bankers, in the way of their business; and he considered, that, although the bills were delivered for a particular purpose, that purpose was the performance of a duty as bankers; and that they came to the defendants' possession in the course of business. That negotiable securities, transferred by delivery to a *bona fide* holder for value, are deemed, with respect to such holder, and to the extent of the rights acquired by him by the transfer, the property of the person transferring, whether the transfer be express or implied; and the *bona fide* holder acquires a title which did not belong to the person who gave them to him. And that the defendants had a lien upon the bills for the general balance due to them from Burn.

The house of lords reversed the decision of the court of exchequer chamber. Lord Campbell delivered an opinion in which Lord Lyndhurst (lord chancellor,) briefly concurred. They disapproved of the doctrine laid down by Tindall, C. J. in the court of common pleas, that the defendants had no lien because the bills did not belong to Burn. On this point they concurred

with Lord Denman; that the bills being negotiable by delivery, the defendants had a right to consider them the property of Burn, without any express representation by him to that effect. That the holder of negotiable securities is to be assumed to be the owner, and third persons, acting *bona fide,* may treat him as such: and that a lien in such cases may exist, although the securities should turn out to be the property of a stranger. And as to the lien of bankers, they concurred with Lord Kenyon in *Davis* v. *Bowsher, (supra.)* But they held there could be no lien in this case, because, under all the circumstances, these exchequer bills could not be considered as deposited with the defendants as bankers. That the defendants procured the new exchequer bills for the express and only purpose of delivering them up to Burn, that he might deposit them in the tin box, which would give them no lien; and if they had no lien when they obtained them, no lien would afterwards be obtained by the overdrawing of Burn.

The case of the *Bank of the Metropolis* v. *New England Bank,* came before the supreme court of the United States twice, once in 1843, (1 *How. U. S. R.* 234,) and again in 1848. (6 *Id.* 212.) The Bank of the Metropolis, in the district of Columbia, had been for a long time dealing and corresponding with the Commonwealth Bank of Mass., which failed on the 13th day of January, 1838. They had mutually remitted for collection such bills, &c. as either might have, which were payable in the vicinity of the other, which, when paid, were credited to the party sending them, in the account current kept by both banks, and regularly transmitted from one to the other; and they regularly settled upon these principles, charging postage, protests, &c. &c., the balance being sometimes in favor of one and sometimes of the other. On the 24th day of November, 1837, the Bank of the Metropolis owed the Commonwealth Bank $2200, and in the latter part of that year the Commonwealth Bank sent to the Bank of the Metropolis for collection in the usual way, sundry paper which would fall due in February, March, April, May and June following. They were indorsed E. P. Clark, Cashier, who was the cashier of the N. E.

Bank, payable to C. Hood, Cashier, who was cashier of the Commonwealth Bank, and by him to G. Thomas, Cashier, who was cashier of the Bank of the Metropolis. On the day the Commonwealth Bank failed, its cashier wrote a letter to the Bank of the Metropolis, directing it to hold the paper that had been so forwarded, " subject to the order of the cashier of the N. E. Bank, it being the property of that institution." The N. E. Bank sued the Bank of the Metropolis for the proceeds of all the paper so sent, and the court below gave judgment for the N. E. Bank. The cashier of the Commonwealth Bank testified that they were never the property of the Commonwealth Bank, nor had that bank any interest therein ; but they were, at the time of the receipt thereof, and ever after, the property of the N. E. Bank, and subject to its order and control. At this time the Commonwealth Bank was indebted to the Bank of the Metropolis about $2900. These notes, &c. were indorsed by the cashier of the N. E. Bank without consideration, and were placed in the hands of the Commonwealth Bank for the mere purpose of collection. On the cause coming back to the supreme court the second time, the court said the jury should have been instructed that if, upon the whole evidence, they should find that the Bank of the Metropolis, at the time of the mutual dealings between them and the Commonwealth Bank, had notice that the latter had no interest in this paper, and transmitted it to the Bank of the Metropolis for collection merely, as agent, then the Bank of the Metropolis could not retain it, as against the N. E. Bank, for a general balance due to the Bank of the Metropolis from the Commonwealth Bank. And if the Bank of the Metropolis had not such notice, and regarded and treated the Commonwealth Bank as owner, still it could not retain the paper against the real owner, unless credit had been given to the Commonwealth Bank, or balances suffered to remain in the hands of the latter, to be met by the negotiable paper transmitted, or expected to be transmitted, in the usual course of dealings between the two banks. But if the jury found that in their dealings the Bank of the Metropolis had regarded and treated the Commonwealth Bank as owner of the paper so

transmitted for collection, and had no notice to the contrary, and upon the credit of such remittances, made or anticipated in the usual course of dealing between them, balances from time to time were suffered to remain in the hands of the Commonwealth Bank, to be met by the proceeds of such negotiable paper, then the Bank of the Metropolis could retain said paper, as against the N. E. Bank, for the balance of account due from the Commonwealth Bank.

These cases declare the law within the jurisdiction of these courts of last resort, respectively.

The principles they maintain, applied to the principal case, are fatal to the defendants. They received the note for collection merely. For, notwithstanding the words "for account," in the letter, and which perhaps referred to the two items carried out, such was the testimony. It is to be supposed, from their own practice and experience, and from their knowledge of business generally, that the defendants knew that a large amount of the paper they received from the Canal Bank, was placed there for the sole purpose of collection. This was notice enough to put them upon inquiry; and, at least, sufficient to prevent them from relying upon these notes as securities for advances or for a balance; and brings the case within the principle laid down in the *Bank of the Metropolis* v. *New England Bank,* (*supra.*) Under such circumstances, they were bound to know that, at most, they had no lien except upon paper owned by the Canal Bank. By the usual course of the dealings between the two banks, no credit was given for a note sent, until collected; and the bank sending it could recall it at any time. And when a note was dishonored, it was immediately returned and the expenses charged. The defendants, in this case, after the Canal Bank failed, took back what was uncollected by the Canal Bank, by them before sent to that bank. But what seems wholly inconsistent with any implied contract for a lien, on every Monday all balances were paid up. This note was in the hands of the defendants between three and four weeks before the Canal Bank failed; and consequently the two banks squared all accounts two or three times during that period. And had not the

Canal Bank failed, they would have settled and paid all up on both sides, probably, many times before this note became due. This wholly repels the idea of any contract for a lien, express or implied. The plaintiffs in *Clark* v. *The Merchants' Bank* failed, because it was clear that the draft was not sent for collection, but to be credited. And the defendants failed in *Brandão* v. *Barnett*, because they received the bills (or the new ones in exchange) to return again, which was inconsistent with a lien, even as against Burn. In the case of the *Bank of the Metropolis* v. *New England Bank*, the court held the former must maintain a position similar to that of a *bona fide* purchaser, that is, for value and without notice. And *Brandão* v. *Barnett* comes to nearly the same point. Here, as we have seen, the note was sent for collection merely; and by the course and practice of the business it was to be returned when called for, at any time before it was collected, and also if not collected. Thus, in some important particulars, coming within the principles laid down in the cases to which I have already adverted.

It may be added, that as against the plaintiffs in this cause, the defendants could not retain the note for a pre-existing debt, due from the Canal Bank. (*Stalker* v. *M'Donald*, 6 *Hill*, 93.) So that, suffering former balances to remain in the hands of the Canal Bank, on the strength of such paper, would not give to the defendants title as against the real owner, though perhaps it would be different in cases coming before the supreme court of the United States. (*Swift* v. *Tyson*, 16 *Pet.* 1.) It would seem that the defendants may be treated by the plaintiffs as their agents, (*Bank of Orleans* v. *Smith*, 3 *Hill*, 560,) unless the defendants are in a position to insist upon their mere legal title, on the ground that they are *bona fide* holders, in the sense of that term, in this state; which we have seen is not the case.

There must be judgment for the plaintiffs.