## BROWER *a.* PEABODY.

### *Court of Appeals ; September Term,* 1855.

### BURDEN OF PROOF.—CONVERSION.

Where the plaintiff in an action for conversion proved title to the goods down to
the time when they came into the hands of the defendant, and the defendant re-
lied upon an apparent title in another party from whom he took in good faith,—
*Held,* that the *burden of proof* was on the defendant to show such title in the
party through whom he claimed, as would sustain his defence.

Appeal from a judgment of the Supreme Court, in the first
district, affirming a judgment entered upon the report of a
referee.

This case was before the general term of the Supreme Court
in November, 1854 ; and the argument and opinions rendered
are reported in 18 *Barb.*, 599. The facts will be found fully
stated in that report. They were briefly as follows. The
plaintiffs, John Brower and Jacob Cram, made an agreement
with one of the defendants, Thomas E. Lovett, to sell to the
firm of Thomas E. Lovett & Co., in which he was a partner,
fifty barrels of potashes, for $1657 08, to be paid on delivery.
Lovett engaged freight for the goods in the ship Fidelia, for
Liverpool. The plaintiffs sent the goods to the vessel by their
carman, who took receipts for them in the usual form, and
gave them to the plaintiffs. Lovett being in the office of the
plaintiffs and seeing the receipts on Brower's desk, stole them,
and carried them away. On the same day he presented them
to the owners of the vessel and procured a bill of lading in
his own name. He then drew a bill of exchange against the
shipment, and assigned the bill of lading to one Hasluck, who
advanced funds to him upon it, in good faith. The defendant
Peabody, the master of the ship, refused to deliver the goods
to the plaintiffs, but delivered them to the holders of the bill
of lading, in Liverpool.

The referee found these facts, and he further found that it
was the commercial usage in New York, to deliver bills of
lading to any person who produces the ship's receipts, without

reference to the names mentioned in the receipts, and without requiring endorsement. The receipts are by usage regarded as mere memoranda from which to make out the bills of lading. He also found, as conclusions of law, that the plaintiffs were bound to know this usage, and that they were therefore chargeable with negligence in not having given immediate notice to Peabody, or to the owners or agents of the vessel, that the receipts had been stolen. He therefore reported that Peabody was entitled to judgment in his favor for costs, and that the plaintiffs were entitled to judgment against the other defendants, Lovett, and Bethune his partner.

The plaintiffs appealed from the judgment in favor of Peabody. The Supreme Court at general term affirmed the judgment, on the ground that the conduct of the plaintiffs in sending the goods to the vessel, pursuant to *Lovett's* contract of affreightment, was calculated to beget the belief that Lovett was the owner of the goods; and the plaintiffs were in fault in not correcting this impression, without delay, as soon as they discovered the receipts had been stolen.

The plaintiffs appealed to the Court of Appeals.

*Francis Byrne* and *James W. Gerard*, for appellants.—I. There was no delivery of the ashes to the defendants, " Lovett & Co.," under the contract, although they were put on board of the vessel designated by them; the property and possession therefore remained in the appellants, they having obtained receipts in their own name, &c. (*Chitty on Contracts*, 427; Craven *v.* Ryder, 2 *Marshall*, 127, *S. C.*, 6 *Taunt.*, 433, *Holt*, 100; Meredith *v.* Meigh, 22 *Eng. Law & Eq. R.*, 91; Palmer *v.* Hand, 13 *Johns.*, 434; Jones *v.* Bradner, 10 *Barb.*, 193; Fram Jee *v.* Thompson, 3 *Moore's Indian Appeals*, 422.) And the referee does not find that there was any *delivery* of the property to Lovett & Co. (Ewen *v.* Smith, 2 *Cl. & Fin.*, *House of Lords*, 309.)

II. Obtaining goods with an original intent not to pay for them when delivered, is a *larceny* of the goods. It may be put to the jury *animo furandi*. (*Barb. Cr. Tr.*, 2 ed., 157; Rex *v.* Pratt, *R. & M. C. C. R.*, 250; Rex *v.* Gilbert, *Ib.*, 185; White *v.* Garden, 5 *Eng. Law & Eq. R.*, 379.)

III. The respondent had no right to give bills of lading, except to the appellants, or to a person having a *lawful* right to the goods and *lawful* possession of the receipts. (Jones *v.* Bradner, 10 *Barb.*, 200; Ruck *v.* Hatfield, 5 *Barn. & A.*, 632; Zachrisson *v.* Ahman, 2 *Sand.*, 68; Everett *v.* Coffin, 6 *Wend.*, 603.)

IV. The receipts having been *stolen*, the right of the appellants to the possession of the goods cannot be affected by the felony, the doctrine of "*market overt*" not being the law here. (Wheelwright *v.* De Peyster, 1 *Johns*, 471; Ash *v.* Putnam, 1 *Hill*, 302; Andrews *v.* Dietrich, 14 *Wend.*, 31; 20 *Ib.*, 21; Carow *v.* Hoffman, 22 *Ib.*, 285, 294, 318; Peabody *v.* Fenton, 3 *Barb. Ch. R.*, 451; Robinson *v.* Dauchey, 3 *Barb.*, 20; Mowry *v.* Walsh, 8 *Cow.*, 238; Saltus *v.* Everett, 20 *Wend.*, 277, 281; 15 *Ib.*, 476.) And such receipts were the same in law as the goods. (Pollock *v.* National Bank, 3 *Seld.*, 274; Zachrisson *v.* Ahman, 2 *Sand.*, *S. C. R.*, 68, *supra;* 2 *Rev. Stats.*, 4 *ed.*, 863 § 66.)

V. Receipts for goods are not of a higher character than bills of lading drawn to order and endorsed, (if so high), yet in this country, bills of lading, as contracts, possess no negotiable properties. They convey to the holder on a transfer no greater right than he would acquire by the delivery of the goods they represent. The defendant Peabody could, therefore, have defended against his bill of lading by showing that the receipts on which it was issued were feloniously obtained. (Bates *v.* Stanton, 1 *Duer.*, 79; King *v.* Rathbon, 6 *Whart.*, 418). In England the highest right ever accorded on the transfer of a bill of lading is in the case of Lickbarrow *v.* Mason, where it was held that a person who advanced on a bill of lading delivered by the consignor to the consignee, could take the goods as against the consignor who claimed to stop them in *transitu*. (1 *Smith's Leading Cases*, *ed.* 1852, 746, *et seq.*, *notes;* Dows *v.* Cobb, 12 *Barb.*, 314; Gurney *v.* Belwood, 3 *Ellis & Black*, 633.) The cases show that an advance on a stolen bill of lading, or a bill of lading obtained on stolen receipts, though in the hands of a third person for value, would convey no greater right than if the advance had been made on the property itself. The case is much weaker for Peabody,

as he is a mere *receiver* of the stolen receipts, on which he gave out a bill of lading, and not as in the case above put, the holder of a bill of lading.

VI. The appellants never having "*entrusted*" the receipts nor parted with the title or possession of the property to Lovett, and he not being either *factor* or agent of the appellants, he could not by his fraud and *felony* transfer to the assignees of the bills of lading (although they advanced thereon *bona fide,*) any title to the goods or to the bills of lading.) Hatfield *v.* Phillips, 14 *Mees & W.,* 665, *S. C.,* 12, *Cl. & Fin.,*343; Palmer *v.* Hand, 13 *Johns.,* 434; Williams *v.* Merle, 11 *Wend.,* 80; 2 *Kent's Comm.,* 7 ed., 374; Saltus *v.* Everett, 20 *Wend.,* 267; *Ib.,* 476; Covill *v.* Hill, 2 *Seld.,* 374, *Laws of* 1830, § 3; Zachrisson *v.* Ahman, 2 *Sand.,* 68.)

VII. The respondent detained the goods and refused to deliver them to the appellants, or to sign bills of lading therefor. No *lien* or bond was claimed, but in the pleadings the respondent puts himself on his absolute rights, and the denial of the claim of the appellants was placed on the ground that respondent had signed bills of lading, and was bound to deliver to persons other than the appellants; he is, therefore, confined in his defence to the grounds of refusal assigned at the time of demand. (Van Buskirk *v.* Purinton, 2 *Hall,* 561; Saltus *v.* Everett, 20 *Wend.,* 267; Winter *v.* Coit, 3 *Seld.,* 293; Holbrook *v.* Wright, 24 *Wend.,* 169).

VIII. The custom proved is not a lawful custom, and the appellants cannot be deprived of their property by the same. No custom can control a general rule of law, especially one arising on the sale of chattels. (Ostrander *v.* Brown, 15 *Johns.,* 9; Hurton *v.* Locke, 5 *Hill.,* 437; Bowen *v.* Newell, 4 *Seld.,* 190, 2 *Greenl. Ev.,* § 249; Woodruff *v.* Merchants' Bank, 25 *Wend.,* 673; S. C., 6 *Hill,* 174).

*Samuel Beardsley* for respondent.—I. The referee did not find any demand made by the plaintiffs upon the defendant Peabody, for a delivery of the potashes in question to them, or any refusal by him to make such delivery; and, therefore, no right of action against him was shown.

II. The exception taken by the plaintiffs to the ruling of the

Brower *a* Peabody.

referee in matters of law, was general, and raises no particular question which can be examined by this court. The exception should have stated the particular point excepted to, as is required in excepting to the charge of a judge. (Code 1851, § 272, 268; Jones *v.* Osgood, 2 *Seld.*, 233, and cases there cited.)

III. Where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the injury must sustain the loss. (Lupin *v.* Marie, 2 *Paige*, 172; Root *v.* French, 13 *Wend.*, 572).

IV. This principle applies where property is agreed to be sold by a contract fraudulent on the part of the purchaser, said property being delivered pursuant to the contract, or where the sale and delivery are conditional; for in such cases, although the sale and delivery do not, as between vendor and vendee transfer the right of property to the latter, if the vendee makes sale of the property to a *bona fide* purchaser for value, or induces a person *bona fide* to incur some liability or enter into some engagement upon the assurance and belief that the person to whom said property had been so sold and delivered was the true owner thereof, the original seller, as to said *bona fide* party, has no right or remedy, for his right to the property is paramount to that of the original owner. (White *v.* Garden, 5 *Eng. L. & E. R.*, 379; Root *v.* French, 13 *Wend.*, 570; Buffington *v.* Gerish, 15 *Mass.*, 156; Haggerty *v.* Palmer, 6 *Johns. Ch. R.*, 437; Chapman *v.* Lathrop, 6 *Conn.*, 110, and note; De Wolf *v.* Babbett, 4 *Mas.*, 289; Keeler *v.* Field, 1 *Paige*, 312; Lupin *v.* Marie, 2 *Ib.*, 169; Rowley *v.* Bigelow, 12 *Pick.*, 307; Hoffman *v.* Noble, 6 *Metc.*, 68; Young *v.* Grote, 4 *Bing.*, 253; Pringle *v.* Phillips, 5 *Sand. S. C. R.*, 157).

V. This case falls directly within the principle which has been stated. 1. The plaintiffs agreed to sell the defendants Lovett & Bethune, the potashes for $1657 08, " to be paid in cash on the delivery of the potashes." 2. Lovett & Bethune thereupon agreed with the owners of the ship of which the defendant, Peabody, was master, for the freight of said property to Liverpool in said ship. 3. The plaintiffs, *in pursuance of said agreement to sell*, sent the property on board said ship, thereby delivering the same to Lovett & Bethune. 4. The

delivery was completed on the morning of 9th of October, 1850; after which, and on that day, Lovett procured of the defendant, Peabody, a bill of lading for said property, which he, on the same day, assigned to one Hasluck, who advanced upon said security $1453 33. 5. In giving said bill of lading and in making said advance, the defendant, Peabody, the owners of the ship, and said Hasluck, all acted in good faith, having no reason to suspect fraud. 6. The delivery of the property by the plaintiffs being completed on the 9th of said October, they had then a right to call on Lovett & Bethune to pay or return the property; and had they done so at the time when said delivery was completed, no difficulty would have occurred, for no bill of lading would have been given or money advanced; but Lovett & Bethune were not called on to pay until the 10th of October, after all the mischief had been done. 7. It is unnecessary to advert to the facts found by the referee, which show the negligence with which the plaintiffs acted in transacting this business, and that every thing on the part of Peabody and the owners of the ship was done in the usual course of business:—*e. g.* the usage and custom to give bills of lading to any person who produces the ship's receipts, as Lovett did in this instance,—the neglect of the plaintiffs to give notice when the property was sent on board the ship not to make any bill of lading to Lovett & Bethune until the property had been paid for,—the neglect to give any notice whatever to the owners of the ship, or to the defendant Peabody, until two or three days after the delivery of the property on board ship, although such notice might have been given in ten minutes,—the negligence in not calling on Lovett & Bethune for payment until the day following the day when the delivery was completed. These facts are not required to make out a defence in this case, for the sale and the delivery of the property to the purchasers was enough to enable them to deal with the property as owners thereof, with parties acting *bona fide* in respect thereto.

VI. The owners of the ship were bound by their bill of lading to deliver the potashes in Liverpool; and as to them, and Peabody, their agent, the plaintiffs had no right to the property.

GARDINER, C. J.—There was no delivery of the property, the subject of this suit, to Lovett & Co., the fraudulent purchasers. The terms of the contract were cash upon delivery, and there is no allegation or proof, that the agreement was modified or changed in the slightest particular. Under this agreement, as the referee finds, the fifty barrels of potashes were delivered, not to the purchasers, but on board the ship of which the defendant Peabody, was master, and receipts were taken, as the answer alleges, in the name of the plaintiffs. The answer of Peabody states, "that the receipts so given contained a statement of the receipt in good order from the said John Brown on board the ship Fidelia, of the said fifty casks of potashes, describing them by their marks;" —and in reference to the usage, he avers " that the receipts for the goods and merchandise so delivered on board such ship, are given by the master of the ship or his agent to the person delivering the same, and that bills of lading are not given to the individuals who have engaged freight therefor, nor to any other person except on the production and surrender of said receipts to the master or his agent, and upon such production and surrender, bills of lading are forthwith given." Looking at the acts of the plaintiff in the light of the contract and the custom thus established, it is manifest, that there was no intention to deliver the property to Lovett & Co., and that the owners never for an instant parted with the possession of the ashes, but placed them on shipboard in their own names, and took and retained in their custody, the evidences of their title furnished by the defendant, which gave them the absolute control of the property, and bound the ship's master to execute or withold the bills of lading according to their direction. To call this a delivery to Lovett & Co., or a general delivery, is a palpable misnomer.

Stopping here, we find the property in the ashes unchanged. They were subsequently demanded of the defendant, who refused to recognize the right of the plaintiffs and disposed of them in Liverpool, by the orders of other persons ; the *onus* then devolves upon the defendant to establish a legal right thus to interfere with the property of the plaintiffs without their consent, and against their own wishes. He relies upon

the fact that the receipts were on the same day presented at the office of the owners of the ship by Lovett, who procured a bill of lading in his own name, and in the same sentence the referee finds that the receipts were stolen from the office of the plaintiff.

The act of Lovett through which the defendant is compelled to make title, was a felony for which he could have been indicted and convicted, under section 66 of the article "of robbery, embezzlement, and larceny" (2 *Rev. Stats.*, 679). If the custom or usage which lies at the foundation of the defence, is valid, the receipts were property, and the value of the commodity affected, as transferable by the instrument, would be deemed the value of the article so stolen, (*Ib.* 466.) An argument is unnecessary to prove that a title thus derived cannot be urged to the prejudice of the true owner. The familiar principle is thus stated in Saltus *v.* Everett (20 *Wend.*, 279.) "property in things movable can only pass from the owner by his own act and consent, except in those cases, when such owner has by his own direct voluntary act conferred upon the person from whom the *bona fide* vendee derives title, the apparent right of property as owner, or of disposal as agent." No fact is found or exists in this case, to make it an exception to the general rule. The receipts, although recognized as *prima facie* evidence of property in the thing receipted for, in those who have them in possession, do not, it is presumed, enter into the currency, and, like bank notes, become the property of a *bona fide* holder.

It is said that nothing but the receipts were stolen; the ashes were untouched. The defendant converted the property, and this act, apparently unauthorized and tortious, he justifies under evidences of title stolen from the possession of the owners. It seems to have been forgotten that the plaintiffs are not required to prove a negative, but the defendant must in some way show affirmatively a transfer of the property in bar of the action.

No reliance was placed upon the facts occurring subsequent to the commission of the felony, by the learned counsel for the respondent. They can have no influence upon the decision It may be true as a matter of fact, what the referee seems to

have found as a conclusion of law, that the plaintiffs would have acted more wisely by giving immediate notice to the ship owners, instead of pursuing the thief and reclaiming their property, but an error of judgment of this sort, if it was one, cannot divest them of their property or create a title in the defendant.

The judgment should be reversed.

---

## CHURCHILL *a*. MARSH.

*New York Common Pleas; General Term, September*, 1855.

MARINE COURT.—JURISDICTION TO GRANT ATTACHMENT.—SEAL REQUISITE TO PROCESS.

*It seems*, that the acts of 1852 and 1853, extending the jurisdiction of the Marine Court so as to permit a recovery to the amount of $500, also extended the power of that Court to issue an attachment against the property of a non-resident, when the amount claimed does not exceed that sum.

An attachment against property, issued out of the Marine Court, must be issued under the seal of the Court. and, if not so sealed, and the defendants do not appear in the action, (although they come into Court to object to the proceedings,) the Court do not in virtue of the attachment, or the summons founded thereon and not personally served, acquire any jurisdiction of the defendant, and their judgment, founded on such unsealed attachment, by default, must be reversed.

Appeal from a judgment of the Marine Court.

This was an action brought in the New York Marine Court, by William Churchill, Jr., against Joseph B. Marsh and Cornelius G. Van Deusen, for the recovery of $229 91, due on a promissory note made by defendants to the plaintiff. The action was commenced by an application to one of the justices of the court, February 9, 1855, for an attachment against the property of the defendants as non-resident debtors, under the act to abolish imprisonment for debt and to punish fraudulent debtors, (*Laws of* 1831, *ch*. 300). A warrant of attachment, returnable February 12, was accordingly issued; which, how-