CHARLES DEVLIN *against* SAMUEL N. PIKE AND OTHERS.

In an action for the conversion of certain barrels of whiskey, the plaintiff was allowed to recover as damages the highest market price of the same quality of whiskey between the time of the conversion and the time of the trial:

*Held*, error, and that as the price had fallen between the time of the conversion and the time of the commencement of the action, the plaintiff should not have been allowed to recover more than the value of the whiskey at the time of the conversion, and interest to the time of trial.

The measure of damages in actions for the breach of an agreement to return or replace property, or to deliver it, where the price has been paid, or for the conversion of it in cases where there is no ground for exemplary damages, considered and stated. *Per* Chief Justice DALY.

*It seems* that where the plaintiff, with the intention of defrauding the United States Government of the revenue duty, purchased whiskey and caused the indicia of title to be made out in the name of a fictitious person, and delivered them to his agent, to be used in carrying out the scheme of defrauding the Government, and the agent fraudulently induced another person to pretend that he was the person named as the purchaser of the whiskey, and this person having received from the agent the indicia of title, then sold the whiskey to defendants, who purchased it in good faith and for value : *Held*, that plaintiff was estopped from claiming that he was the owner of the whiskey. *Per* Chief Justice DALY.

APPEAL from a judgment of this court entered on the decision of a judge thereof after a trial before him without a jury.

The action was brought to recover the value of five hundred and fifty barrels of whiskey, which the plaintiff alleged he had purchased from the defendants King & Story, and which the defendants Pike & Co. also claimed by purchase from the defendants King & Story while it was stored in the warehouse of the defendant Mullany. The facts are fully stated in the opinion of Chief Justice DALY.

DALY, Chief Justice.—Independent of any other question in this case, a new trial must be granted for error in respect to the measure of damages. The judge found as a conclusion of law that the defendants were liable for the highest price, or market value, which whiskey of the same description attained from the

time of the conversion. In adopting this rule as the measure of damages, the judge simply followed, as he was bound to do, the decision of the Court of Appeals in *Markham* v. *Jaudon*, 41 N. Y. R. 236, in which it was held that the rule of damages in an action for the conversion of railroad stock was the highest market value of the stock *between the conversion of it and the trial.* But this decision has, after a careful examination and review of the authorities, been deliberately overruled by the Court of Appeals in the recent case of *Baker* v. *Drake*, all the judges concurring (53 N. Y. 211).

The whiskey in the present case was purchased by the plaintiff at 40 cents a gallon. It was bought by the defendants S. N. Pike & Co., eleven days after the plaintiff purchased it, at 32 cents, which that firm considered then to be about one cent below the market price; but it appearing that the market price of whiskey of that description had been as high as 77 cents a gallon between the time of conversion and the trial, the judge adopted 77 cents a gallon as the measure of the plaintiff's loss.

The suit was commenced on the 19th of September, 1867, about ten days after the conversion; so that the injury which the plaintiff sustained could then have been repaired by the purchase of an equal quantity of the same kind of whiskey for about half the amount he has recovered in this action. It could have been bought, down to the time of the commencement of the suit, at as low a price, at least, as the plaintiff paid on the 23d of August, which was 40 cents a gallon, the whole amount paid by him upon the purchase being $13,139; whereas, for the conversion of it about two weeks afterwards he received $25,293 27, or, as I have said, nearly double the amount he could have bought a like quantity for when he commenced this suit. The case, therefore, furnishes the same illustration that was used by RAPALLO, J., in *Baker* v. *Drake* (*supra*), to show the unreasonableness and injustice of the rule.

It was a serious question in the case of *Baker* v. *Drake*, whether the action was for the conversion of the stock, or for a breach of a special contract; but for the purpose of reviewing the correctness of the rule laid down at the trial, as

the measure of damages, they treated the case as if the action were one brought for the conversion of personal property, re-marking that the rule of damages should not depend upon the form of the action; that, in civil actions, the law awards to the party injured a just indemnity for the wrong which has been done him, and no more; whether the action be in con-tract or in tort, except in those special cases in which punitory damages are allowable. It was, therefore, a direct determina-tion by the Court of Appeals, that in actions for a conversion, the highest price which the article has reached in the market, between the conversion and the trial, is not in all cases the just measure of damages. In this case, as in that, the same kind of property had, after the commencement of the action and before the trial, undergone alternate elevation and de-pression, so that the reasoning of the court and the determina-tion they made is, I think, entirely applicable in the present case.

In the case before the Court of Appeals (*Baker* v. *Drake*), the defendants had purchased shares of stock for the plaint-iff, upon the deposit with them by him of what is known as a margin. They afterwards sold the stock contrary to the terms or understanding upon which they had agreed to carry it, and the plaintiff recovered, as the measure of his damages, the highest price which the stock had reached during a course of successive elevations and depressions, between the time of the sale of it by the defendants and the time of the trial, which made a difference to the amount of $18,000, for which the plaintiff had judgment.

In reversing the judgment and ordering a new trial, the court held : 1. That this was a conjectural loss, founded upon the supposition that the plaintiff would not only have supplied the necessary margin, and caused the stock to be carried through all its fluctuations, until it reached its highest value; but that he would, as " one endowed with the supernatural power of prescience," seize that precise and fortunate moment to sell; thus avoiding the subsequent decline, and realizing the highest profit. 2. That in respect to such a transaction, which was as likely to result in loss as in profit, an inflexible

rule that the highest amount of profit which, up to the time of the trial, might possibly have been obtained under the most favorable circumstances, was to be awarded to the plaintiff, without regard to the probabilities of his realizing such profits or not, was a wide departure from the elementary principles upon which damages are allowed ; which is an amount sufficient to indemnify the party injured for the loss that is the natural, reasonable and proximate result of the wrongful act, and which a proper degree of prudence on the part of the plaintiff could not avert.   3. That if he were deprived of the chances of a rise in the price, it was accompanied with the corresponding chances of a decline, and of his not availing himself of the rise at the precise moment.   4. That when informed of the sale of the stock by the defendants, the plaintiff could have notified them to replace it, and if they failed or refused to do so, that his remedy was to do it himself, charging them with the loss, if any ; and that the advance in the market price of the stock from the time of the sale, *up to a reasonable time within which to replace it*, would afford the plaintiff complete indemnity.

Much of what is here said is applicable to the present case. From the time of the conversion to the time of the trial, whiskey of the same description fluctuated from 17 to 77 cents a gallon ; and awarding the plaintiff the highest price, as the measure of his damages, was assuming what was assumed by the court below, in *Baker* v. *Drake*, that, but for the conversion, the plaintiff would have realized the highest price that the article attained.   Whiskey of this description declined steadily for a considerable period from the time of the purchase, by the plaintiff, of the five hundred barrels in controversy, so that there was in this, as in the case in the Court of Appeals, the feature that the purchase might have resulted in loss to the plaintiff, instead of profit; that the probability of the one was as great as that of the other, the assumption that he would have realized the highest value being purely conjectural. For a staple commodity, its fluctuation, during this period, would seem to have been relatively as great as that of the shares of stock in *Baker* v. *Drake*, and was no doubt largely influ-

enced by the taking off of the government tax of $2 a gallon upon this kind of whiskey—an event which occurred eleven months after the plaintiff's purchase. Whether, therefore, the plaintiff, had he been left in the possession of the property, would have gained or lost by his purchase, was a matter of the loosest conjecture, and the possibility that he would have gained was too uncertain to constitute a basis for the computation of damages. It was a bare contingency, and very naturally suggests the question put by Lord Abinger, in *Lee* v. *Miner*, 2 M. & W. 839—how can a verdict be found for contingent damages which might never have occurred?

In *Baker* v. *Drake*, the plaintiff never had had possession of the stock, and had paid but a small sum as a margin towards the purchase of it, the stock being held by the defendants at the plaintiff's risk, subject to the chances of its increasing or diminishing in value. It was, in fact, a stock jobbing speculation, and in that respect differs from the present case, in which the plaintiff has been deprived of property that he bought and paid for. I do not see, however, that that makes any difference in the application of the reasoning of the Court of Appeals.

The present case, in respect to the true measure of damages, more nearly resembles a class of cases, some of which are commented upon by RAPELLO, J., in *Baker* v. *Drake*, where the plaintiff has parted with stock under an agreement to return, or to replace it by other stock, within a specified time; or where the defendant refuses to deliver goods under a contract of sale, where the price has been paid; in which class of cases it has been held that the proper measure of damages at the plaintiff's option, is the value of the property at the breach of agreement, or its value at the time of the trial (*Shephard* v. *Johnson*, 2 East, 211; *McArthur* v. *Ld. Seaworth*, 2 Taunt. 257; *Downs* v. *Bact*, 1 Starkie's N. P. C. 313; *Hamson* v. *Hamson*, 1 C. & P. 412; *Owen* v. *Routh*, 14 Com. Bench, 327; *Forrest* v. *Elwes*, 4 Ves. 492; *Elliot* v. *Hughes*, F. & F. 387; *Barrow* v. *Arnold*, 8 Q. B. 279). Before adverting to the rule laid down in the cases above enumerated, it may be well to remark that they afford no countenance for the propo-

sition that the plaintiff could recover the highest price which the article reached at any intermediate day between the accruing of the cause of action and the trial, "because," says Mr. Mayne, "such a measure involves the assumption that he would have sold out upon that day, which is purely speculative profit" (Mayne on Damages, p. 83). On the contrary, in one of them (*McArthur* v. *Lord Seaforth*, 2 Taunt. 257) the plaintiff insisted that he was entitled to the highest price which the property, certain stock, had reached at any intermediate day between the day stipulated for replacing it and the day of trial; but the court refused so to increase the damages; adverting to the distinction between an advantage that he *would* and one that he *might* have derived; that is, between what was reliable, or certain, and that which was purely speculative and conjectural. And in a subsequent English case (*Startup* v. *Cortuzze*, 2 Cr. Mees. & Rosc. 165), where a portion of the purchase money had been paid, it was held that the plaintiff was not entitled to speculative damages to cover profits which he *might* have made, had the property been delivered.

There are two cases, however, in this State, where the purchase money, or a part of it, had been paid, in which the rule was carried to this unreasonable length (*West* v. *Wentworth*, 3 Cow. 83, and *Clark* v. *Pinney*, 7 Id. 681). These cases are reviewed by RAPELLO, J., in *Baker* v. *Drake*, &c., who, without distinctly overruling them, states that they are questioned by high authority. Judge DUER, in *Suydam* v. *Jenkins* (3 Sandf. 614), after a very careful examination, holds that they were incorrectly decided; and, to the same effect, are the decisions in Connecticut, Massachusetts, Maine, Pennsylvania, Kentucky, Louisiana and the Supreme Court of the United States (see the cases collected in *Suydam* v. *Jenkins, supra*, 642, 643).

The reason given where the purchase money has been paid is, that the plaintiff cannot, with the money, go into the market and buy other goods of the like kind, and that, therefore, all fluctuation in price should be at the risk of the vendor who refuses to deliver (per RAPELLO, J., in *Baker* v. *Drake*.) This is undoubtedly so if the plaintiff can prove that he would

have realized a higher price if the goods had been delivered; but it does not follow that he must or would have realized the very highest price which the goods reached at any one time between that period and the day of the trial, and unless that can be assumed, the rule has nothing to support it, but what is conjectural and speculative. "The wrong-doer," in the language of Judge DUER, in *Suydam* v. *Jenkins, supra,* "must not be permitted to derive any benefit or advantage from his wrongful act;" and, consequently, if it appear that he afterwards sold the goods at a higher price than their value at the time of the breach of the agreement, or that he is still in possession of them, and they are of increased value, there is then something reliable to act upon, and their increased value in either of these cases may be taken as an exact measure of what the plaintiff has lost by the withholding of the property; but, says the same eminent jurist, " the highest intermediate value, whether the action be trover or assumpsit, ought never to be taken as the measure of damages, unless the evidence justifies the belief, *not that it might,* but that it *would* have been realized by the plaintiff had he retained the possession of the property " (per DUER, J., *Suydam* v. *Jenkins, supra*).

The English rule that the plaintiff has in these cases, where he has parted with the property, or paid the price, the option to take the value at the time of the breach of the agreement, or at the time of the trial, is a more reasonable one. He is, of course, entitled to recover the value of the property at the time when it ought to have been delivered to him; for clearly that is, at that time, the measure of his loss. If the article, however, which he has bought and paid for, is a staple commodity, which can readily be replaced by purchase, he may go into the market and buy an equal quantity, and if he has had to pay an increased price, that increase, added to what he has already paid, with interest upon the latter up to that time, is the measure of his loss. But he may not have the means to do this, and being kept out of the property and of his money down to the time of trial, he is entitled to such relief as will place him in *statu quo,* without requiring him to lay out a sum of money which possibly he may not possess (*Owen* v. *Routh,* 14 C. B.

336). For this reason it is a just rule, if the property is of the description ordinarily bought and sold for the purpose of traffic, and the market price of it is higher at the time of the trial than it was at the breach, that the price then, if the plaintiff has commenced his action within a reasonable time, is the proper measure of his indemnity, as it is a sum with which he can go into the market and purchase an equal quantity of property of the same kind;—the loss by the increase falls, as it should, upon the wrong-doer, and the plaintiff gets the increased value; which is in effect the same as if the property had remained in his hands instead of being withheld from him up to that time by the defendant. If the plaintiff has not commenced the action within a reasonable time, then he should be limited to the value at the time of conversion, with interest; but it may be questioned how far the rule of the increased value at the time of trial can be applied in this State, since the decision of the Court of Appeals in *Scott* v. *Rogers* (31 N. Y. 676), which will be hereafter referred to. If the property be of less value at the time of the trial than it was at the time of the breach, the plaintiff, it is true, can then purchase it for less money; but to adopt that diminished value as the measure, would be to give the wrong-doer the benefit of the difference, whilst the plaintiff has, in the meanwhile, been deprived of any opportunity of disposing of the property. Hence the propriety, in all cases, of allowing the plaintiff to recover at least the value at the time of the breach, with interest, as his additional damages.

This is not, like the last cases we have been considering, an action for the breach of an agreement. It is, at least, so far as respects the remedy which is sought in damages, what would formerly have been an action of trover brought where the defendant came innocently into the possession or control of the property, and withheld it from the plaintiff without lawful excuse. It is in effect, however, the same, a wrongful withholding of property which the plaintiff claims he is entitled to have delivered to him, and the rule in respect to the measure of damages, which is adopted in the one, would seem to be equally applicable in the other (*Scott* v. *Rogers*, 31 N. Y. 676; *Suydam* v. *Jenkins*, *supra;* *Baker* v. *Drake*, *supra*). In such an ac-

tion, where there is no ground for vindictive damages; where the question litigated simply is whether the plaintiff or the defendant is entitled to the property; where the plaintiff's recovery is strictly limited to what will be compensatory for the taking or withholding and the deprivation of all use of the property down to the day of trial; the general rule has been the value of the property at the time of the conversion, with interest, as the additional damages. (See the cases collected in *Suydam* v. *Jenkins, supra.*) It is not, however, an invariable one, for there may be cases in which the plaintiff should and the defendant should not have the benefit of an increase in the value of the property after the conversion; which may be illustrated by a recent case in this court, where the defendant dispossessed the plaintiff of a young horse, and shortly after the conversion the animal developed an extraordinary rate of speed, by which its value was very largely increased, and in which the plaintiff recovered a sum in damages equal to the increased value of the horse; and other cases might be suggested in which the increased value of the thing after conversion is the true measure.

In the case I have referred to of *Scott* v. *Rogers* (31 N. Y. 676), an agent in Buffalo was instructed by his principal to sell a certain quantity of wheat upon a day fixed, or send it to New York. The agent kept it over and sold it upon the next day, which was held to be a conversion, and the measure of damages adopted at the trial was the highest market price of the wheat between the time of the conversion and a reasonable time within which to bring the action, which, under the circumstances shown, was fixed at four months. The case was twice argued in the Court of Appeals, and the judgment was affirmed. The only opinion given upon the affirmance was delivered by Judge HOGEBOOM, who said that he considered the question reasonably well settled to allow the plaintiff the highest price between the time of conversion and a reasonable time within which to bring the action; but what adjudications he relied upon for this statement does not appear, for he cites no cases. He further remarks, that some of the cases carry the period up to the time of the trial of a suit commenced within a reasonable

time, and that as between these two periods, the time of the commencement of the suit and the time of trial, the rule is somewhat fluctuating, and he finally states that he thought that the estimate of the value of the property must *in all cases* be a reasonable time after the conversion. Not a single case is referred to throughout the opinion, except *Suydam* v. *Jenkins, supra,* which is upon a different point, and whilst just respect is certainly due to the opinion of a judge of the Court of Appeals, I nevertheless feel constrained to say that neither the rule which the learned judge thought must be applied in all cases, nor the reasons adduced in support of it, are to my mind at all satisfactory, whether the rule be regarded as a deduction by him from adjudged cases, or as resting upon the reasons he has given for it. The decision made by the court, which is all that is binding, is to be distinguished from the opinion, and it is simply this, that it is not error in such a case to instruct the jury that they may give the highest market price between the time of the conversion and a reasonable time within which to bring the action, the effect of which I understand to be that the plaintiff is entitled to avail himself of this rule, if it will afford a more substantial indemnity, in all actions for the conversion of merchandise ordinarily bought and sold in the market; not that it is the sole and inflexible rule which is to be applied in all actions for the conversion of personal property. I hesitate, however, to hold that the English rule of the increased value at the time of trial can be applied in this State, at the plaintiff's option, in all cases, in view not only of the decision in *Scott* v. *Rogers, supra,* but of the observation of RAPALLO, J., in *Baker* v. *Drake supra,* that the plaintiff's remedy in that case was to replace the stock, charging the defendants with the loss, if any, and that the advance in the market price of it from the time of the sale up to a reasonable time within which to replace it, would afford the plaintiff complete indemnity. This observation may, perhaps, have been appropriate solely, and therefore possibly limited, to the circumstances of the particular case, which was simply a stock jobbing speculation; still, a doubt arises when this observation is taken in connection with the previous decision in *Scott* v. *Rogers, supra,* and this being

Devlin v. Pike.

the case, it is more appropriate that we should abstain from deciding this point, and that it should be left to the court of last resort hereafter to settle whether or not the increased value at the time of trial may or may not be taken as the measure where there has been a conversion, or a failure to deliver merchandise of this description.

Leaving this question, therefore, where it is, I think as the result of the adjudged cases that the law in other respects may be stated to be this : That in actions for the breach of an agreement to return or replace property, or to deliver it, where the price has been paid, or for the converting of it, in cases where there is no ground for exemplary damages, the measure of damages is a question of law, the plaintiff's recovery being limited to what will compensate him for the loss sustained; that in all cases he is entitled to recover the value of the property at the time of the breach, or of the conversion, with interest up to the day of trial, as his additional damages ; that if the property converted or to be delivered consists of merchandise which is ordinarily bought and sold in the market for the purpose of traffic, the plaintiff is entitled to recover the highest market price which that kind of merchandise may have reached between the time of the breach or conversion and a reasonable time within which to replace it, or to bring the action ; that what is a reasonable time depends upon the circumstances of the particular case, and where the facts are undisputed is a question of law; that if the property has been sold by the defendant at a higher price than the plaintiff paid for it, or than its value at the breach or the conversion, the plaintiff may adopt that sum as the measure of his compensation; that if the property has permanently increased in value, that value, as ascertained and proved upon the trial, is the proper measure ; that if the property at the time of the trial is of greater value than it was at the time of the breach or conversion, and the defendant is still in possession of it, the plaintiff is entitled to its increased value at the time of trial as the proper measure of his indemnity ; and lastly, if the plaintiff can prove not that he *might*, but that he *would* have realized a greater sum for the property than he paid for it, or than its value at the breach or

the conversion, he is entitled to have that sum as the measure of his damage.

Mr. Mayne, in his work on Damages, p. 84, says, in respect to what is the proper measure in the cases we have been considering, that the American cases are hopelessly in conflict. He has not, I think, sufficiently appreciated the intrinsic difficulty of the subject, and that, beyond holding that the plaintiff is entitled to indemnity, it is exceedingly difficult to fix upon rules that will be general in their operation ; for what will be a full indemnity to the plaintiff may, to a great degree, depend upon the circumstances of the particular case. I have attempted above to distinguish rules which may be received as having the authority of adjudged cases or the sanction of eminent judges, but it by no means follows that they will meet the exigencies of every case. They recognize a right of option in the plaintiff in the cases stated, and it is more just that he should have it when it affords a more exact measure of indemnity, than that he should be limited, as appears to be the rule in Massachusetts, to the market value at the time of conversion, as the sole and invariable measure.

Giving full effect in the present case to the rule which was applied in *Scott* v. *Rogers, supra,* the very highest amount which the plaintiff could recover upon the evidence was what he paid for the whiskey, 40 cents a gallon, with interest from the time of the conversion ; for instead of rising, it fell in value between that time and the commencement of the action. The suit was commenced within seven days after the alleged conversion, and as there was no increase in the market value of the whiskey during that time, the plaintiff, if entitled to recover, was necessarily limited to the value at the time of conversion, with interest.

I have given this large amount of attention to this important question of the measure of damages, because as there must be a new trial it is desirable that the judge, who is to try the cause again, should, if the plaintiff is entitled to recover, be able to apply the correct rule as to the measure of damages, but also for the additional reason that questions are constantly arising in this court upon this difficult subject, so as to make it

a matter of much practical importance that the subject should be fully examined, and the law, so far as respects its administration by us, should be ascertained and agreed upon.

We have now to consider the main question discussed in the case; whether the action can be maintained at all. The facts, as either found by the judge or sustained by the evidence, are as follows: The plaintiff, whose business is that of a contractor for the grading and regulation of streets, became interested in a rectifying house. A person named Blish advised him that whiskey could be taken, rectified and made profitable by making it into Bourbon, and Blish having introduced to the plaintiff a person named Clark, who was in the whiskey business, the plaintiff, after several conversations with both of them, requested them to purchase whiskey for him, directing Blish to make the purchase in his (Blish's) name. They accordingly purchased 500 barrels of whiskey for him from the defendants King & Story, making a partial payment, the vendors crediting Blish upon their books with the purchase. Upon the payment of a further installment, Devlin, the plaintiff, was present, and, as he testified, was introduced to King & Story as the purchaser, which both King and Story in their testimony denied. When the last installment of the price was paid, Clark and Blish being both present, the vendors handed Blish the bill, which was made out to him, and he returned it, saying that he did not transfer such orders in his name; and upon being asked what name he wanted the whiskey transferred in, he conferred with Clark, and Clark, with Blish's approbation, directed the vendors to make it deliverable to the order of John Roberts. The orders upon the collector of the revenue, and upon the warehouseman, who had the whiskey in charge, were accordingly indorsed by King & Story, so as to make it deliverable to the order of John Roberts, upon his giving acceptable bonds for the payment of the tax to the government. John Roberts was a fictitious name, there being in fact no such person, the intention being to have the whiskey bonded in the fictitious name, in violation of the law of the United States, which required the whiskey to be bonded in the name of the true owner, and which was part of a scheme,

as will appear more fully hereafter, to defraud the government out of the tax, the price paid for the whiskey being but $13,139, whereas the tax upon it to the government amounted to the very large sum of $60,000.

Blish gave the paper to Clark; all that Blish had to do for the plaintiff being, as he testified, to see that the whiskey was properly gauged; that the prices were correct; and to pay the price, and then, in pursuance of an agreement between Clark and the plaintiff, to give the papers to Clark, who was to obtain the permit of removal and get the bonds for the rerectification of the whiskey, the intention being, as Blish testifies, when it was bonded, to take it to the plaintiff's rectifying house, where it was to be rectified, and being then branded by Blish, as Bourbon whiskey, it was to be returned and sold in bond.

Clark took the papers, on the evening of the day he received them, to the plaintiff. He directed the plaintiff's attention to the name of the fictitious John Roberts, and swears that the plaintiff knew that John Roberts was a fictitious name, showing that the plaintiff was a party to the scheme that was subsequently attempted to be carried out. Clark testified that the understanding with the plaintiff was that he, Clark, was to use the papers then shown to the plaintiff in passing the whiskey in bond to the plaintiff's rectifying house, or some rectifying house; that nothing was. said as to how it was to be done; that he did not explain the mode of doing it, nor the necessity of security; that, as he understood, the whole transaction was left by the plaintiff with him, to do as he thought best. Clark, as he says, not having the necessary time, put the papers in the hands of one Ford, a speculator " engaged in various businesses," who, Clark says, " was working with me in this kind of matters," and who having formerly been a clerk in a bonded warehouse, was more familiar than he was with the routine of the business. He says he gave Ford no particular instructions, except to get the whiskey out of bond for the purpose of rerectification. He says : " I put the papers into his hands to effect a certain purpose, and I guess I told him who John Roberts was. I think I told him that he was a fictitious person." He further says that he

told him that the whiskey had been purchased to have it recti-
fied, that it was to be removed to a rectifying house, but did
not tell him where ; that the bond had to specify where the
rectifying establishment was ; but that was a matter for Ford
" *entirely to find out ;* " that the whole thing was left to him,
and that he (Clark) did not understand that it was necessary
for Ford to go to any particular rectifying house.

Ford testified that Clark spoke to him about this lot of
whiskey before it was bought, and that when he received the
papers, Clark told him that they were the papers of the lot of
whiskey of which he had previously spoken to him ; to have
the matter arranged as soon as he could ; that " if *that lot
could be fixed,* he had another lot right away as soon as it was
fixed—that is, if the whiskey got out of bond ; " that he asked
Clark who John Roberts was, and Clark told him he was a
myth ; to which the witness added that it was understood be-
tween Clark and himself, when he and Clark first talked about
this lot of whiskey, that fictitious names were to be used ; that
it was understood at the time when Clark left the papers with
him, that the securities were to get $150 each ; that his (Ford's)
compensation was to be $5 a barrel (which would be $2,500),
and that he believed Clark was to have the same.   That they
talked about what it was to cost to get the whiskey out of
bond, and that it was $20 or $30 a barrel, which the party
that Clark represented was to pay.   This would be $10,000 or
$15,000, the tax, as I have said, being $60,000, indicating very
clearly that this large sum of money was to be earned in some
dishonest way.

A few days after the papers were left with Ford, a rectifi-
cation bond was prepared, signed in the name of John Roberts
and by two sureties.   He says he told a man to get a couple of
bondsmen ; that he did not know who the bondsmen were, or
whether they were responsible or not ; that he saw them sign
the bond, but had forgotten their names ; that he handed the
papers, with the exception of the order upon the warehouse-
man, which he kept, to a person to whom he was introduced
in a saloon, whose name he had forgotten ; that he had the name
in his memorandum book, and had tried to " hunt it up two or

three times;" that he did not know whether this man signed the name of John Roberts to the bond; that he did not know whether his name was John Roberts or not; that he did not recollect; and near the close of his examination he said that he thought his name was Luttrell; that when he first talked to Clark about the whiskey, before it was purchased, an arrangement was made that it was to be got out of bond by the payment of " that amount per barrel " (which I suppose refers to the $20 or $30 per barrel previously mentioned by him), and that bondsmen *were to be hired.* He was asked if they were to be what are called *bogus bondsmen,* and his reply was, " I do not know who the bondsmen were; I do not know anything about it." The three witnesses I have referred to, Blish, Clark, and Ford, were all called by the plaintiff, so that the statement above made rests upon evidence derived from the plaintiff's own witnesses.

What was requisite under the laws and the regulations of the United States government to have the whiskey removed in bond, appears by the evidence. It was necessary to have a bond signed by *the owner of the whiskey,* and by sureties. This bond had to be presented to the collector of the tax of the district, and approved by the United States authorities, upon which the collector would give an order upon the warehouseman for the transfer of the whiskey. If it was rectified in bond, it had to be returned to the warehouse within the number of days mentioned in the bond.

Clark says that he heard afterwards that a bond was presented for the withdrawal of a portion of the whiskey, but did not hear of its being rejected. King, however, one of the vendors, after the whiskey had been fraudulently disposed of in the manner hereafter to be detailed, went with the plaintiff, at his request, to the collector, to inform him that the plaintiff was the owner, and the collector said that he was glad to find out an owner; that there had been an application made to him for the removal of a hundred barrels of the whiskey *upon fraudulent bonds,* and that he had a mind to seize the whole of it; to which King says the plaintiff did not make much of a reply.

It is very evident, upon this state of facts, that the plaintiff, acting through the instrumentality of Clark, Ford, and the person supposed to be named Luttrell, was engaged in an attempt to defraud the government out of the $60,000 tax, by getting the whiskey removed upon a fraudulent bond, to which a fictitious name was attached in place of the real owner, together with sureties hired for the occasion, of whom nobody could give any account, and that the attempt was unsuccessful. What followed was the result of the failure of this scheme, and was the retributive consequence of making use necessarily of dishonest instruments to effect a dishonest purpose—consequences which should not fall upon innocent parties, but upon the plaintiff, for whose benefit the scheme was concocted, and by whose instrumentality these agents were set in motion.

Within about a week after the purchase of the whiskey, a person called upon the vendors King & Story, having with him the gauger's certificate and the order upon the collector making the whiskey deliverable to John Roberts. He told Mr. King that he was Mr. Roberts ; that he had either lost or mislaid the order upon the warehouseman, and asked if he could give him duplicates. King & Story knew nothing of the fact that John Roberts was a fictitious name. Indeed, King testified that he asked Clark who Roberts was, and that Clark said he thought he was doing business in John street. This Clark, upon being afterwards examined, denied, adding, "I think it was stated that it was an assumed name ; that there was no such person existing." But the judge has found that King & Story had, up to this time, no notice or intimation that John Roberts was a fictitious person ; which is sufficient upon this point. King replied that he could not give the duplicates without going to Mr. Dows, from whom they bought the whiskey ; and King says that, supposing he was doing right, as the person calling had the original papers in his hands, he went with him to Mr. Dows and procured a duplicate order upon the warehouseman. King testified that this was a general custom in the trade in regard to giving duplicate orders upon warehousemen for goods in store, but, under the plaintiff's objection, he was not permitted to show what the

custom was, nor the cases to which it applied; nor that he believed the person calling upon him was John Roberts.

Having in this way obtained a duplicate order upon the warehouseman, and being then in possession of all the necessary papers for a sale and transfer of the whiskey, this person effected a sale of it to the defendants S. N. Pike & Co., through the instrumentality of a Mr. Dreyfous,. a member of a firm engaged in the whiskey business. On the 3d of September, seven days after the purchase of this whiskey by the defendant, A.. J. Dittenhoeffer, a lawyer of this city and an ex-judge of the Marine Court, introduced a person to a notary named Langbein as John Roberts, who made his acknowledgment before the notary to an order upon the collector for the transfer of the whiskey to the defendants S. N. Pike & Co., the notary certifying that he knew the person appearing before him to be John Roberts, the person named in the instrument of transfer and by whom it was executed, and on the 7th of September following, S. N. Pike & Co., in good faith, upon receiving all the necessary instruments of transfer,. purchased the whiskey in the regular course of business for 32 cents a gallon, paying for it $10,511 49.

In two days afterwards,. the plaintiff commenced this action against S.. N. Pike &. Co., the warehouseman Mullany, and King & Story for a conversion of the whiskey, S. N. Pike & Co., and Mullany, having previously refused upon demand to give it up to him. The action was in part for equitable relief, and an injunction was granted enjoining Mullany from delivering it, and S. N. Pike & Co.. from selling, assigning, or in any way interfering with it, which injunction was dissolved upon S. N. Pike & Co. giving a bond to be answerable for any damages that might be recovered in the action.. This bond having been filed, there is no longer any equitable relief to be given.. The question. is one of damages,. and when. that is the only question in the case it should be tried by a jury, unless the defendants waive it (*Bradley* v. *Aldrich*, 40 N. Y. 504; *Barlow* v. *Scott*, 24 Id. 40; *Beck* v. *Allison*, 4 Daly, 423).

Where a party has been deprived of his property by a fraudulent sale. of it to another, it is no answer to his claim

that the defendant was an innocent purchaser, in the regular course of business, who paid a full consideration for it, unless the owner, through his negligence or by some inexcusable or wrongful act on his part, has been himself the means of enabling his agent, or, in this case, his instrument, to effect the fraud, by deceiving parties acting with ordinary caution (*Ex parte Swan*, 7 Com. B. 431 to 435; *Swan* v. *The North British Australian Co.* 7 Hurls. & Nor. 632 to 635; *Young* v *Grote*, 4 Bing. 258; 12 J. B. Moore, 484; *Sheffield* v. *Manchester Railw. Co.* 7 M. & W. 574; *Pickard* v. *Sears*, 6 Ad. & E. 469; *The Bank of Ireland* v. *Evans' Charities*, 5 H. of L. C. 389, 483; *Taylor* v. *The Great Indian Peninsular Railw. Co.* 28 Law J. Ch. 285; on appeal, Id. 710; *Carmichael* v. *Beck*, 10 Rich. Law S. C. R. 332; *McNeil* v. *National Bank*, 46 N. Y. 325; *Wooster* v. *Sherwood*, 25 Id. 286; *Crocker* v. *Crocker*, 31 Id. 507; *Bassett* v. *Spofford*, 45 Id. 387; 2 Daly, 432; *Craig* v. *Ward*, 3 Keyes, 387; *Dunning* v. *Roberts*, 35 Barb. 467; *The Western Trans. Co.* v. *Marshall*, 37 Id. 509; *Saltus* v. *Everitt*, 20 Wend. 268, 284; Story on Agency, § 221, 7th ed.; Hilliard on Sales, 48, 3d ed.)

This being the law, the question arises whether this is not such a case. To accomplish a purpose which the parties had in view, the plaintiff left the whole of the matter in the hands of Clark, to do as he thought best. The *indicia* of title to the property was left in his hands, with the plaintiff's approbation, after the plaintiff knew that the power to transfer it, or to enter it in bond, was, in the formal papers, vested in a fictitious name. The vendors were thus led to believe that the title to the whiskey, and the consequent right to transfer it, was in a real person named John Roberts—a state of things which the plaintiff recognized and approved. Baron Wilde held, in *Swan* v. *The North British Australian Co. supra*, that if a man has led others into the belief that a certain state of facts exists, by conduct calculated to have that effect, and they have acted on that belief, to their prejudice, he shall not, as against such persons, show that that state of facts did not exist; and Lord Denman, in *Pickard* v. *Sears, supra*, says that the rule of law is clear, that where one, by his words or conduct, *will-*

*fully* causes another to believe the existence of a certain state of facts, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of facts. We start, therefore, with the proposition, as matter of law, that King & Story had the right to believe, from acts of the plaintiff's agent, which the plaintiff recognized and approved, that the whiskey had been transferred to a real person whose name was John Roberts, and that as between them and the plaintiff they should not be prejudiced by anything they may have done under that conviction, acting in good faith, unless they were guilty of negligence. Now a person comes to them, introducing himself as John Roberts, and, to satisfy them that he is, exhibits to them the papers which they had themselves signed, transferring the whiskey to John Roberts, with the exception of the order upon the warehouseman, which he tells them he has either lost or mislaid, and asks them if they can give him a duplicate. He has in his hands certain papers—the order upon the collector and the gauger's returns—without which, and the giving of acceptable bonds or the payment of the duties, no one could get the whiskey, and has the papers, through the plaintiff's instrumentality, in the prosecution of a dishonest scheme, by agents whom he has set in motion. King evidently supposed that the person introducing himself as John Roberts had received these papers from Clark, to whom King & Story had given them, and such was the fact; for, with Clark and Ford's concurrence, they had passed into his hands intentionally, to be employed for a very different purpose from the use he made of them. He was, in fact, as were all who undertook to carry out the nefarious scheme that was meditated, the plaintiff's agent or instrument. Where the question is, who shall lose by the fraud of an agent—the principal or an innocent third party?—the rule is, that the principal is estopped from denying the authority of the agent where his own negligence or wrongful act has enabled the agent to cheat a person who, in the particular transaction, has acted with ordinary caution (*Taylor* v. *The Great &c. Railw. Co.* 28 Law J. 285 ; on appeal, 710 ; *The Bank of Ireland* v. *Evans'*

*Charities*, 5 H. of L. C. 389, 413). " We may lay it down as a broad, general principle," says Justice Ashurst, in *Lickbarrow* v. *Mason* (2 Term R. 63), "that whenever one of two innocent persons may suffer by the act of a third, he who has enabled such person to occasion the loss must bear it;" and C. J. Erle, in *Ex parte Swan, supra*, was of the opinion that throwing the loss from the party who has acted with ordinary caution to the party who has caused the loss by willful imprudence, operates to promote the substantial interests of commerce. The question then is, whether King & Story, in recognizing the person who called upon them as John Roberts, and giving him, upon his request, a duplicate of the order they had signed, acted with a want of ordinary caution. King testified that there was a general custom in the trade, in regard to giving duplicate orders upon warehousemen for goods in store; but he was not permitted to show what the custom was, under the plaintiff's objection that it was immaterial and irrelevant. It was, I think, relevant to the inquiry, whether King acted negligently or not, and in my judgment would have been material if it were the common usage and custom to give duplicates to parties representing that they had lost or mislaid the original, and having in their possession, as evidence of their title, all the other original papers. " Ordinary care is such as is usually exercised in the like circumstances by a majority of the community" (Shearman & Redfield on Negligence, § 20). The Court of Appeals has declared the rule for determining what ordinary care and vigilance demand of a party upon a given state of facts to be simple, practical, and easy of application. " The question is," says Porter, J., " what would a majority of men of common intelligence have done under like circumstances?" (*Ernst* v. *Hudson R. R. R. Co.* 24 How. Pr. 108; 35 N. Y. 26, 27); and if this be the test, it was certainly competent to show that King & Story acted as was the general usage and custom among merchants, if there were any; whereas, upon this point they were precluded from showing anything at all, upon the ground that it was immaterial. It was a case in which, in my judgment, the fullest inquiry should have been allowed as to any general usage prevailing among merchants in the giv-

ing of such duplicates. To hold upon the evidence before the court that there was, upon the part of King & Story, a want of ordinary caution, was to assume that they were bound to ascertain the identity of the person calling; to go to, or require Clark to be brought to them to ascertain if he were John Roberts, and were not warranted in assuming that he was because he had all the other papers except the order upon the warehouseman, which, as a conclusion of law, is, at least, doubtful. It is a question, moreover, whether this was not a case in which the plaintiff, by his own negligence, or wrongful act, co-operated and contributed to the production of the injury of which he complains; for if he had not, for a dishonest purpose, had a formal transfer of the whiskey made to the imaginary John Roberts, and allowed, for the same purpose, all the other papers to get into the hands of the person who called upon King & Story, that person would never have been able to pass himself off upon them as John Roberts, the owner of the whiskey. It is not unreasonable to assume that if he had not had with him all the other papers, and that they believed him to be the John Roberts named in the transfer, they never would have given him a duplicate of the original, which he alleged he had mislaid. The plaintiff's own wrongful act then materially contributed to produce the result of which he complains, and if, but for that act, it would or could not have happened, it may be said to have been a case of co-operating negligence. Shearman & Redfield, in their excellent treatise upon the Law of Negligence, deduce as the general rule upon this subject, from a long array of authorities, that one who is injured by the mere negligence of another, cannot recover at law or in equity, any compensation for his injury, if he, by his own negligence, or willful wrong, contributed to produce the injury of which he complains; so that but for his concurring or co-operating fault, the injury would not have happened to him (ch. 3, § 25); and I confess that I do not see, after having given the matter much reflection, why this is not such a case, where the liability of the defendants King & Story is founded, as it must be, upon their alleged negligence or want of ordinary caution in giving the duplicate order. At all events, the question of negligence, as it

is presented upon the evidence in this case—whether the inquiry relates to the want of ordinary caution on the part of King & Story, or to co-operating negligence on the part of the plaintiff—is one of those doubtful and uncertain questions of negligence which are to be left for their determination to the united judgment of a jury, and not disposed of as questions of law (*Ireland* v. *Plank Road Co.* 3 Kern. 533; *Keller* v. *The N. Y. Central R. R. Co.* 24 How. 272, 273; *Beers* v. *The Housatonic R. R. Co.* 19 Conn. 566; *Bernhardt* v. *Rensselaer &c. R. R. Co.* 32 Barb. 165; *Phil. &c. R. R. Co.* v. *Spencer*, 47 Penn. St. 300; *Munroe* v. *Leach*, 7 Met. 274; *Clayards* v. *Dethick*, 12 Q. B. 439; Shearman & Redfield on Negligence, § 11). If the test of the want of ordinary caution, or the test, as it is more frequently called, of ordinary negligence is, as it has repeatedly been held to be, the omission of that care which men of ordinary prudence would take, under the like circumstances, a jury are quite as competent to apply such a test as a court; for it is one which is wholly derived from personal experience and knowledge, and it may be that a juror, if he is accustomed every day to mix in the active commerce and business of the world, will be able to apply it in the particular case, with more discrimination and practical experience than a judge. It is for this reason that the tendency of the courts, both in this country and in England has, of late years, been to leave these questions of negligence exclusively to the jury, except where the legal conclusion from the facts is irresistible and plain; and as the case must be tried again, and will probably be tried by a jury, that disposition should be made of this question here.

If the conclusion arrived at should be that King and Story were not guilty of negligence in giving a duplicate order under the circumstances, then the conclusion would follow, that the plaintiff was himself responsible for the *indicia* of title having got into the hands of an agent, who was enabled thereby to dispose of the property to the plaintiff's prejudice; and that a sale by the agent, under such circumstances, would vest a solid title in innocent purchasers for value, as S. N. Pike & Co. were (*Wooster* v. *Sherwood*, 25 N. Y. 286; *Crocker* v. *Crocker*,

31 Id. 507; Hilliard on Sales, ch. 4, p. 48, 3d ed.); for in the pithy language of Baron Wilde, in the case already quoted of *Swan* v. *N. B. Australian Co.*: " A man is not permitted to charge the consequences of his own *fault* upon others, and complain of that which he has himself brought about."

A new trial should be granted.

LARREMORE, J.—I concur with Chief Justice DALY, in granting a new trial in this action, on the authority of *Baker* v. *Drake*.

The earlier cases for non-delivery of merchandise have made a marked distinction in the application of the rule of damages, between actions where the purchase price had been paid in advance, and those where it was to be paid on delivery.

This distinction is recognized, but in no sense fully approved as to the measure of damages, in the case last referred to.

The language of Judge RAPALLO, in *Baker* v. *Drake* (53 N. Y. 211), plainly indicates the principle that is hereafter to govern the decision of cases of this character. He says, " the question is, whether or not, under the circumstances of the case, the rule adopted by the court below (following *Markham* v. *Jaudon*) affords the plaintiff more than a just indemnity for the loss sustained. In a case where the loss of probable profits is claimed as an element of damage, if it be *ever allowable* to mulct a defendant for such a conjectural loss, its amount is a question of fact, and a finding in respect to it should be based on some evidence."

And further, in commenting upon the case of *Greening* v. *Wilkinson* (1 C. & P. 625), he says, " It falls short of sanctioning the doctrine that, as a fixed rule, the plaintiff is entitled absolutely to recover the highest price prevailing at any time before the end of the trial, without any evidence showing it was even probable that he would have realized such price."

No such evidence appears in this case, and without it, the spirit and intent of the decision referred to evidently holds that such damages are speculative.

Whether or not the plaintiff would have retained the whiskey until the time it reached the market value of seventy-seven cents, and disposed of it at that opportune moment, is in this case a question of conjecture, and not of proof. That he might have done so does not meet the requirement of the rule above mentioned, or authorize the recovery of damages upon such a possibility.

I am for a reversal of the judgment, and a new trial, with costs to abide the event.

J. F. DALY, J., (dissenting).—In my judgment, the facts warranted a recovery by the plaintiff, and there was no error in the ruling as to damages.

I. The fact that the plaintiff contemplated a fraud upon the government (if such were the fact), by bonding the whiskey in fictitious bonds, or by irresponsible parties, did not authorize any of the parties to whose possession the orders on the collector, the inspector's or gauger's certificate, came, to use those documents for the purpose of defrauding the plaintiff, and converting his property. Nor does such unlawful design of the plaintiff affect his right to recover against the defendants, who have no title. The documents in question having been committed to Ford, for the purpose of bonding the property for redistillation, conferred no authority to sell or dispose of the whiskey otherwise. The plaintiff neither parted with the the property, nor with any *indicia* of title thereto. The duplicate warehouse receipt, the only evidence of title possessed by defendants, was procured by fraud, without plaintiff's knowledge or consent. The documents committed by plaintiff to Ford conferred no title. The case seems to be clearly within the rule in *Saltus* v. *Everett* (20 Wend. 267).

II. We are not justified in holding that there was error in the measure of damages. This is an action for conversion, where the plaintiff was the absolute owner of the property, and had paid the full price for it before the conversion. It is, therefore, to be distinguished from *Baker* v. *Drake* (53 N. Y. 211) and *Markham* v. *Jaudon* (41 N. Y. 235). The Court of Appeals, in the former case, in reasoning upon

the rule, generally did not, and could not in that case lay down a rule for the measure of damages in this, since they distinguish in principle between such cases. We are rather bound to sustain the rule as laid down in *Lobdell* v. *Stowell* (51 N. Y. 70, Commission of Appeals), until the precise point has been passed upon by the Court of Appeals.

The judgment should be affirmed.

Judgment reversed.